## RUSSELL STEBBINS et al. *vs.* THOMAS N. NILES.

In the year 1834 N. made contracts with various Indians of the Chickasaw nation for a number of land reservations, to the amount of fifty sections, to which the said Indians were entitled under the treaty with the general government; but afterwards, in 1835, N. entered into an agreement with R. S. & Co., by which he was to furnish them, through their agent, an interest in the contracts he had made with said Indians, so as to procure titles to the fifty

Stebbins et al. *v.* Niles.

sections of land, for which R. S. & Co. were to pay N. $50,000, which was $1,000 for each section, and N. was to attend to the survey and location of the land for the company, under the direction of their agent. *Held*, that R. S. & Co. designed by this contract to take in effect the place of N., in the purchase of the fifty sections of land.

The expenses attendant upon the location and survey of the land, did not properly constitute any part of the price or purchase-money to be paid by R. S. & Co. upon the delivery of the warrants or titles to their agents. *Held*, that the expense should properly be paid out of the proceeds of the lands when sold, or contributed *pro rata* by the parties owning the lands.

It is not essential to the validity of an account stated, that it should be signed by the parties; and what constitutes an account stated must in some measure depend upon the circumstances of each case.

A stated account properly exists only where accounts have been examined, and the balance admitted as the true amount between the parties without having been paid.

It is an agreement between both parties that all the articles are true.

The agreement or admission of the party against whom the account is rendered, may be implied from circumstances.

Where merchants reside in different countries, and an account is transmitted from one to the other, and no objection is made, after several opportunities of writing have occurred, an admission of the correctness of the account may be presumed.

The retention of the account in such cases, without objection being made, is evidence of the admission of its correctness by the party against whom it is rendered.

An account rendered is deemed an account stated from the presumed approbation or acquiescence of the parties, unless objection is made thereto within a reasonable time.

It is no objection to the validity of a contract fairly made, when no advantage was sought or taken of the party entering into it, that at the time he was under arrest.

Where legal process has been used as a means of oppression, and to extort disadvantageous terms from a party in custody, instruments of writing so obtained will be set aside. *Held*, that the compromise made in this case by the parties should not be enforced.

That construction will be placed upon a bond of indemnity, which will best accord with the intention of the parties to it. *Held*, that it was intended by R. S. & Co. to indemnify N. against any loss or damage which might arise from his deeds to S., and also indemnify S. from the consequences of future warranties.

No formal words are necessary to constitute a release, where the intention of the parties is manifest. A covenant not to sue, in the very nature of things amounts to a release.

Stebbins et al. v. Niles.

In error from the northern district chancery court at Holly Springs; Hon. Henry Dickinson, vice-chancellor.

Thomas N. Niles filed his original bill in November, 1845, in the northern district chancery court at Holly Springs, and alleges, in substance, that in 1834 and 1835 he contracted with various Chickasaw Indians, for the purchase of reservations to which they were entitled under the Chickasaw treaty of the 24th of May, 1834, to the amount of fifty or more sections; that upon each of these contracts he paid a part of the purchase-money at the time of making the contract, but, being unable to furnish all the money necessary to enable him to carry out the contracts, afterwards, in the summer of 1835, he made, by letters, through Samuel Stebbins, Jr., an agreement with a part of the defendants, styling themselves " The New York Chickasaw Land Association," by which he was to furnish to Stebbins, — who was the agent, as well as a member of the association, — contracts with the Chickasaws, so as to procure titles to fifty sections of land, for which the association was to pay Niles $50,000, or at the rate of $1,000 per section, for which a title should be procured and made to Stebbins in trust for the association, to the extent of fifty sections and no more; that Niles was to attend to the survey and location of the lands, and, under the authority and direction of Stebbins, to sell them; that the profits arising from the sale of the lands after deducting the $50,000 and interest upon it, were to be divided in the proportion of two thirds to the association, and one third to Niles. For his services, Niles was to charge nothing; but his personal expenses in attending to the business, and all other incidental expenses, were to be borne *pro rata;* one third by Niles, and two thirds by the association. Lands were to be sold to reimburse the $50,000 and interest, at not less than $5 per acre, and the residue were to be held at higher rates, according to their value; that Niles, about February, 1836, went to Pontotoc, and proceeded to carry out said agreement on his part, by paying out and perfecting his Indian contracts, with funds from time to time supplied to him by the association through Stebbins; that about July, 1838, Niles rendered to the association, through Stebbins, an account,

23 *

showing a list of the lands purchased by him for the association, and the expense account of the investment; the cost of the lands being $50,000, and the expense account $8,829.30, being a total of $58,829.30, with which the association was then chargeable under said agreement; that said account was received by the association without objection at the time, and that, except as to one item of $44, the correctness of the account was never disputed until 1844; that Niles attended a meeting of the association in the city of New York, about September, 1838, when he made a full exhibit of all his transactions with them, including the items of the expense account up to March, 1838; and at this time it was that the objection was made as to the item of $44, and no other; and said meeting fully approved of all that had been done by Niles in relation to their business, and adopted a resolution to that effect; that Niles, about this time, had procured fifty sections of land to be conveyed to Stebbins, pursuant to said agreement, and Stebbins, on the 13th of September, 1838, pursuant to a resolution of said meeting, executed to Niles a power of attorney, authorizing him to sell such of said lands as then remained unsold, and appended to the power of attorney the account before-mentioned, showing a list of the lands, and their cost, and the expenses thereon, which, with the power, was recorded in the several counties in which the lands were located; that Niles received from the association, through Stebbins, $49,500 in cash, and in the proceeds of bills of exchange, being $500 less than he was entitled to under the said agreement; and that he advanced to the association $4,000, December 20, 1836, and $2,250 January 1, 1838, which was to be repaid to him out of the proceeds of the first sales of land made by him for the association; and, at the same dates, paid the association the like sums, making $6,250, being the entire proceeds of the sale of a section of land belonging to the association; of all which Niles rendered to the association, through Stebbins, an account, about July, 1838, a copy of which account is filed with the bill, as exhibit B., which account is correct, and was received by the association without dispute or objection; that Niles, in January, 1842, was re-

Stebbins et al. *v.* Niles.

quested by one Thomas W. Storrow, who was the secretary of the association, to furnish a formal report of sales, money received, &c.; that Niles had before this, by letter and otherwise, kept the said Stebbins fully advised in reference to all the affairs of the association, and so informed Storrow in his reply; and inclosed to Storrow copies of the accounts previously rendered by him, an account of all sales then made, and an account current between Niles and the association, the reception of which accounts was acknowledged by Storrow on the 11th of November, 1842, without any complaint or objection; that in November, 1843, Storrow advised Niles that Daniel Low, one of the association, would visit Pontotoc, where Niles resided, and requested Niles to give Low all the information he might desire in regard to the affairs of the association; that Low visited Pontotoc in December, 1843, and examined all the books, papers, accounts, &c., connected with the business of the association, and not only made no objection at that time, but reported, after his return to New York, that the accounts of Niles, and his management of the affairs of the association were correct; that Low urged Niles to visit New York in the summer of 1844, which he did, and then delivered to Storrow his accounts with the association, made up to June, 1844, predicated upon the accounts previously rendered by him and not objected to, and his accounts were then objected to for the first time, and the association revoked his power of attorney, and placed the unsold lands, as well as the notes taken for lands sold, under the control of other persons, thus taking from him all power to act further in the premises, and refused to pay him the amount due him for expenses and advances; that Niles had a lien upon the unsold lands of the association, and on those sold and not yet paid for; 1st. To pay him $500, with interest, being the balance of the purchase-money due him under the agreement; 2d. To repay him for the taxes, expenses, advances, and other charges in relation to the land; and 3d, for his share of the profits under the agreement; that by the accounts rendered by Niles to the association, and not objected to for more than six years, which was a stated and settled account, they owed him,

March 1, 1838, $9,329.30, being $8,829.30 for expenses, and $500 for deficiency of payment under the agreement; and July 23, 1838, by an account then rendered and not objected to, they owed him a balance of $15,579.30, including his said advance to them of $6,250; and June 1, 1842, by an account then rendered and not objected to, there was a balance of $12,312.29 due him, exclusive of interest; and on the 1st of June, 1844, they owed him a balance of $14,179.16, including interest, according to an account then rendered to them; that his cash receipts after June 1, 1844, up to October 15, 1844, amounted to $877.86, and his disbursements for expenses during the same period, to $702.09, leaving a balance due him by the association, June 1, 1844, of $14,003.29, for which sum, with interest, he asserts a lien upon the said lands, prior and preferable to any right or claim of the association; that forty-one tracts of land, described by section, township, and range numbers, are a part of the lands procured by Niles for the association, and are still subject to his claim for said balance due him, and for his share of the profits under the said agreement. Sundry sales are then mentioned, and the vendees made defendants, and required to answer how much they owe.

It is also alleged, that James Treat and Stephen Sicard, two of the original members of the association, are dead, and that their heirs are unknown; and that John Ward, Wm. G. Ward, Nathan T. Carryl, John Brower, Wm. W. Deforest, and Charles A. Hecksher, — who are also made defendants, — claim an interest in the lands or their proceeds, by virtue of some transfer from some of the original members of the association, all of whom are made defendants. He prays that a trustee or receiver may be appointed, to have the custody and control of the unsold lands, and of the notes given for the purchase-money of such as had been sold, and the right to sell and collect the same, with instructions to pay Niles the said balance due him from the association, and to dispose of the residue of the lands and notes, according to the agreement between Niles and the association; for an account, an injunction, and for general relief.

The bill was taken for confessed as against Samuel Stebbins,

Jr., Charles F. Moulton, J. L. & S. Joseph & Co., and the unknown heirs of James Treat and Stephen Sicard, deceased; these being one half of the original members of the association. It was answered by Russell Stebbins, Daniel Low, David Lee, Marcena Monson, and Walter Mead, the other half of the original members; and by John Brower, William W. Deforest, John Ward, William G. Ward, Nathan T. Carryl, and Charles A. Hecksher.

The answer, in substance, denies the agreement alleged by Niles in his bill, and asserts that the defendants contracted with Niles for the purchase from him of fifty sections of land, and that the titles to the lands were to be vested in Samuel Stebbins, Jr., in trust for the association, and that for each warrant or title to each section thus vested in Stebbins, they were to pay Niles $1,000; that they were to pay no part of the personal expenses of Niles in attending to the lands, or of the incidental expenses which he might incur in perfecting his contracts with the Indians, or in vesting titles in Stebbins; charge that the lands, when titles were vested in Stebbins, were to cost them only $1,000 per section; deny that the correspondence, filed with the bill of Niles, constitutes the contract with Niles, and allege that a formal contract, upon the basis of a letter of instructions sent by the defendants to Samuel Stebbins, was entered into, and that Niles has the original, the duplicate having been destroyed by fire; charge that they paid Niles $50,000 under the contract, and require proof of the fact that he lost any thing by exchange upon drafts drawn by him to obtain the money from them; they admit that Niles, in 1838, rendered to them an "invoice" of fifty sections of land, and of their cost and the expenses upon them, of which his exhibit A. is a copy; but deny that, as to six of the sections embraced in that statement, — naming them, — any title whatever was ever conferred upon, or vested in Samuel Stebbins, or any other person, in trust for the association. They deny that they were chargeable with the expense account annexed to the invoice, or any part thereof, or that "said account" was received and held by them without objection until 1844. They admit that Niles attended a meeting of the association in New York, in Septem-

Stebbins et al. *v.* Niles.

ber, 1838, and that a power of attorney was executed to Niles by Samuel Stebbins, as charged in the bill; but they deny that Samuel Stebbins had any right to append the invoice with the expense account attached, to the power of attorney. They state, that the expense account was presented by Niles at the meeting in September, 1838, but withdrawn by him when he saw the little favor with which it was regarded; that he did not claim the allowance of the account as a matter of right, but of favor; and no allusion was made to the account in the record of that meeting, because the defendants regarded it as a matter with which they had nothing to do. They admit that, in 1842, Niles furnished to them a copy of his exhibit A., and an account, of which his exhibit C. is a copy; also, that in December, 1843, defendant, Daniel Low, visited Niles in Pontotoc, and there inspected the books and papers relating to the business of the association, embracing the accounts between them up to that time, as Niles had kept them, and that Low urged Niles to visit New York; but they deny that Low sanctioned or acquiesced in those accounts, or that any thing ever occurred which will entitle them to be regarded as stated and settled accounts. They state that Niles visited New York in the summer of 1841, and they supposed he came to settle his accounts; but, after spending several months in the city, he left without having made to the association any report of his proceedings as its agent; on learning which, they met and adopted resolutions of censure, which were sent to him, and in reply he furnished, in August, 1842, the accounts filed by him as exhibits A. and C., the receipt of which was acknowledged by Mr. Storrow, their secretary; that " the reason why no objection was made to those accounts, was, the wish that Niles might again visit New York, and the apprehension that if objections were made, he might be the less disposed to make such visit." That, after waiting for his visit long and vainly, defendant, Low, went to Pontotoc, and there sought from the books and papers of Niles a knowledge of his agency affairs; but they charge that Low then told Niles that there were items in his account, — especially the item of $8,829.30, — which were wholly inadmissible, and would not be allowed; and deny that Low

reported his satisfaction with the accounts of Niles after his return to New York. They admit, that in 1844 Niles again visited New York, when he rendered to them the accounts filed by him as exhibits D. and E. They admit that they did then raise objections to various items of his accounts, but deny that such objections had reference to matters long before stated and settled, and allege that they had never given Niles ground to suppose that they regarded the accounts as settled. That they knew the accounts to be unjust, and had repeatedly informed Niles they would not allow them. They state that up to June, 1844, Niles had received for them, in cash, — including $6,250 paid to Samuel Stebbins, — $21,105.72; and that, including said sum of $6,250, his disbursements properly chargeable to the association fell far short of his receipts; but, in order to retain the money and notes of the association in his hands, he charged them with $8,829.30, without having delivered any account of the particulars of the account, and without having expended, as defendants believe, any such sum; that said item consists of charges for which Niles was personally responsible, for pretended services, hire of an office used by him in his general business, and the like, including, possibly, some money; and that on the first of March, 1842, he charges them, in one item, without specifications, with $2,650.36, and $500, June 1, 1843; that in order to swell his account unjustly, he has charged interest at eight per cent., and made rests and compounded interest, and that many of the items charged in his account are unjust, and contrary to the contract between the parties; and to the bill, account, and claim of Niles, the defendants plead the statute of limitations of six years.

They further allege that Niles was arrested in New York, in October, 1844, upon a writ of *ne exeat* issued upon a bill filed by them in New York, and that, after this, he surrendered all the notes and effects of the company, and agreed to settle all matters in dispute upon terms to which they assented, whereupon he was discharged from arrest, after which, and before the terms of the settlement had been carried out, they proposed to abandon the agreement and let the suit go on, which he declined, and voluntarily came forward and sanctioned the agree-

ment, which was then reduced to writing, and executed by R. Stebbins, on the part of defendants, and by Niles. By this agreement, Niles was to retain the money he had received, and to take seven of the thirty-nine sections of land which he represented as being then on hand unsold, and free from incumbrances laid or suffered by him, in full of all his claim upon, and interest in, the lands of the association; that those seven sections were designated on the 24th of October, 1844. They are set out by their numbers in the answer. Insist that by the terms of the agreement, Niles was responsible to them for the titles to the thirty-nine sections, and they were not to convey the seven sections to him until they had an opportunity to ascertain whether his representations were correct; that they proceeded to investigate the matter with diligence, and learned that six of the thirty-nine sections were without title, of which he was informed, but he has never perfected the title to those six sections, nor refunded the $6,000 that he received for them. Allege that they have always been anxious to carry out the agreement of the 15th of October, 1844, but have made no title to Niles for the seven sections which he was to receive under that agreement, because the titles to the said six sections were incomplete. Aver that they are still ready to abide by that agreement, and insist that it is binding upon Niles, and set it up as a bar to the relief sought by him. They state that after the agreement of the 15th of October, 1844, was entered into, Niles was satisfied with it, and inserted in a newspaper, published in Mississippi, a notice that he had ceased to act as the agent of the association, and that Richard E. Orne was the agent of the association. They deny that Niles has any claim, or lien, upon the lands of the association, or any right to ask or expect the interposition of a court of equity in his favor. They aver that the interest of Charles F. Moulton in the association has been transferred to Daniel Low; that of Samuel Stebbins, Jr., to Russell Stebbins and John Brower; that of J. L. & S. Joseph & Co. to Wm. W. Deforest; and that of James Treat and Stephen Sicard to Marcena Monson.

An amended bill, afterwards filed by Niles, charges that the members of the association, and especially Daniel Low, in-

duced Niles to visit New York in the summer of 1844, in order to get him in their power and defraud him; that on the 15th of October, 1844, they had him arrested in New York upon a writ of *ne exeat*, issued from the chancery court of the State of New York, requiring bail in the sum of $50,000, having filed their bill for the purpose of coercion, and not for any just cause, charging matters apparently just and legal, but actually false; that Niles was unable to give the bail required, and the defendants, Daniel Low, R. Stebbins, and others, on the same day, caused an instrument to be drawn up for Niles to sign, whereby he was to surrender all his interest in the lands under the original contract with them, and the securities he had taken for land sold, and accept seven sections in lieu of all claim for expenses, advances, sales, interest in land, &c.; that Niles was unwilling to sign that instrument, not knowing for what he had been arrested, or what was contained in the bill filed against him, and because his interest in the lands, and sales, and his account, amounted to much more than the value of the seven sections; that he desired to postpone the matter until the next day, in order that he might obtain advice and have time for reflection; but to his proposal for this short delay, the defendant, R. Stebbins, returned a direct refusal, and stated, that if Niles did not sign the paper then, he might not have an opportunity of doing so next day; that, having thus no alternative but to sign the paper or go to jail, Niles did sign it, protesting that he did so because he was in their power, and stating that he would sign any paper they might dictate, and was then released from custody, after having surrendered all the papers and effects demanded of him; that his business required his presence in New York for some days after this; and, fearing another arrest if he openly repudiated the pretended agreement he had signed, he was, therefore, induced to be present October 24, 1844, when the seven sections were drawn for, as provided for in the so-called agreement, and to sign a note of the fact; and on the 19th of November, 1844, having found that by mistake, he had not given up all the securities demanded of him while under arrest, as he then stated he had done, he handed over an attorney's receipt for

three other notes, and had the fact indorsed on the instrument, so as to make the facts correspond with his previous statements; believing the same to have been illegally obtained from him, he intended, from the first, not to be bound by it, but to disavow it as soon as he could do so without danger of another arrest; that the presence of Niles in New York was procured by the artifices of Daniel Low, and the other members of the association, for the purpose of compelling him to surrender his just claim against them, and to sacrifice his interest in said land to their advantage.

The answer — of the same defendants who filed the former answer — denies that the defendants induced Niles to visit New York in 1844, for the purpose alleged in the amended bill, or that they filed their bill in chancery, and obtained the writ of *ne exeat* with the design charged. They allege that Niles was greatly in arrear in rendering his accounts to the association, and the defendant, Low, who visited Niles at Pontotoc in 1843, being dissatisfied with the manner in which Niles kept his accounts, Niles voluntarily assured Low that he would be in New York by the 1st of May, 1844, and if Low urged him to visit New York, it was only to afford him an opportunity of explaining in person the manner in which he had conducted the business, and its situation at the time; that Niles freely and voluntarily visited New York in 1844, and the association had a meeting, Niles being present, when his account and charges against them were discussed, and refused to be allowed; that the defendants, having in vain endeavored to come to a settlement with Niles, and fearing that he might leave unexpectedly, were compelled, in justice to themselves, in virtue of a determination then for the first time formed, to sue out their writ of *ne exeat;* that Niles was arrested about eleven o'clock, A. M., and had every opportunity allowed him of finding bail, or making any arrangement he might wish; that he might, if he had desired, have seen the bill filed against him, or have given bail, but he made no proposal, and expressed no desire of the kind; that he sought an interview with defendant, R. Stebbins, the president of the association, on the evening of that day, and executed the agreement com-

plained of by him voluntarily; that in this interview, Niles was treated with great forbearance and delicacy throughout, and the propositions were discussed without reference to the fact that he was under arrest. The defendants deny that any threats, persuasions, or inducements, were made or held out to induce Niles to enter into the compromise, or that he signed the paper with a protest, or declared that he would sign any paper they might dictate; that by said agreement, Niles obtained full satisfaction for his just claims upon the association, and that after his discharge from arrest, he cordially shook hands with defendant, R. Stebbins, which was after the drawing took place, under the terms of the compromise, on the 24th of October, 1844, when Niles drew the seven sections to which he was entitled, when he made many protestations of friendship, and offered his services to aid Mr. Orne, who was selected as agent in his stead; that Niles remained in New York until late in November, 1844, and was in frequent and friendly communication with the association in carrying out the compromise; and, among other acts, he signed the minute, under date of November 19, 1844, indorsed on said agreement, manifesting his acquiescence in it; that Niles's attempt to repudiate that agreement is an after-thought, devised after he had acquiesced for a twelvemonth or more, and with no view to the attainment of justice; the plea is repeated, that Niles's cause of action arose more than six years before the filing of his bill.

An additional amended bill was filed by Niles on the 10th of January, 1849. Concerning this, it is unnecessary to say any thing here, inasmuch as the entire subject-matter of it, so far as Niles was concerned, was subsequently disposed of by an agreement between the parties; as will be stated hereafter.

The answer of the same defendants who filed the former answer was afterwards, by agreement, as to one of its features, regarded as a cross-bill, and we will proceed to state the substance of the cross-bill only.

The defendants aver that Niles was responsible to them by his contract, as well as by the warranty contained in his deeds, for the titles to the fifty sections of land sold by him to the association; that at one time they were induced to believe that

good titles had been made by Niles to all of the fifty sections, but in this they afterwards ascertained that they were mistaken; that as to six of the sections, naming them, it turned out that Niles himself never had any title, wherefore his conveyance of them to Samuel Stebbins passed nothing; they believe that there is also another section (naming it) without title; and the defect of title consists in this: that the Indian deeds have never been approved by the President of the United States, or by any approving agent in his stead.

They charge, that Niles attempted a fraud upon them by his conveyances of said six sections of land as a part of the fifty' sections sold by him to the association; that by his contract with them, as will be seen from the correspondence preceding it, he was to furnish to them lands of good quality, choice lands; whereas, those six sections are a part of the refuse lands of the Chickasaw cession, and remained unsold until they were entered at an average of about thirty-five cents per acre. They insist that it would be iniquitous now to permit Niles to put off those six sections upon them, as well on account of the lapse of time, as of the inferior quality of lands; and that, in lieu of the lands, Niles should now be required to refund to them $1,000 per section, with eight per cent. interest thereon from March 1, 1836, and to deduct from the expenses charged against them on account of the fifty sections, six fiftieths thereof; and if the other section, before named, should proved to be without title, they ask that the purchase-money, and interest and expenses on account of it, may be refunded.

After the foregoing answer was filed, the following agreement of counsel was entered into: —

" The complainant in this case agrees that the answer of the defendants, Russell Stebbins et al., to his additional amended bill; so far as the same relates to the seven sections of land therein alleged to be without title, shall be regarded as a cross-bill; and that under the pleadings and proofs in the case, the said defendants shall have the full benefit of the said answer as a cross-bill. He further agrees that the certificates, or statements, of the commissioner of the general land office, Richard M. Young, as to the sale of six sections of land in said answer

Stebbins et al. *v.* Niles.

mentioned, to wit: sections 31 and 32, T. 4, R. 9 W.; 34 and 35, T. 10, R. 6 W. and 11 and 13, T. 8, R. 10 W., shall be taken as evidence in the cause; and, also, that his statement in reference to section 12, T. 10, R. 8 W., dated May 11, 1849, shall be taken as evidence. He also agrees that the deed from the Indian to him for the said section 12, T. 8, R. 10 W., is similar in all respects, as to authentication, or want of it, under the treaty, to the deeds for the other six sections herein before mentioned. He also agrees that the deed or deeds from him to Samuel Stebbins for said sections 11 and 13, T. 8, R. 10 W., is or are similar to his deeds to said Stebbins for sections 31 and 32, 34 and 35, mentioned above.  *  *  *  *
And it is further agreed between the counsel for both parties, that the plea, answer, or demurrer of the complainant to the cross-bill of the defendants, shall be filed at once; and that the same, as well as the cross-bill, shall be regarded as having been filed for more than five months."

The answer of Niles to the cross-bill denies that by the contract with the association, as he understood it, or by the warranty contained in his deeds to Stebbins for the fifty sections, he is responsible to the defendants for the seven sections alleged in the cross-bill to be without title. He insists, that by the true construction of the contract, he was not bound to furnish perfect titles to the fifty sections, but merely to furnish contracts with Chickasaw Indians, entitled to land under the treaty of 1834, for fifty sections; and he avers, that he has fully, and in good faith, complied with that contract. If, however, the court should be of the opinion that he was bound, under the contract, to furnish perfect titles, then, he insists, by way of plea in bar to all the relief sought in the cross-bill, that the members of the association, by their proceedings at the meeting held in New York on the 10th of Sept., 1838, and by their bond of indemnity, executed to Niles and Samuel Stebbins on the 14th of Sept., 1838, released Niles from the obligation to perfect the titles to any of the fifty sections, the titles whereto were defective, and took upon themselves the burden of perfecting all such titles. He charges, that about the 8th of Sept., 1838, he had executed to Samuel Stebbins, for the association, quit-

24*

claim deeds for various sections of land, including those seven alleged in the cross-bill to be without title, and, being desired to execute warranty deeds, he positively refused to do so without indemnity, upon the ground that the Indian deeds to him had not been approved by the President, and were, therefore, incomplete; whereupon indemnity was promised him, upon which assurance he executed warranty deeds; that, at the meeting of the association, held on the 10th of Sept., 1838, he exhibited to the members of the association his Indian deeds for the fifty sections of land embraced in the "invoice," and the said deeds were then examined by them, and it was then known to them that the seven Indian deeds for the lands now alleged to be without title, had not been approved by the President, and were imperfect; that, at said meeting, the warranty deeds executed by Niles to Stebbins were produced and examined, and the condition upon which he had executed them was afterwards explained to the other members by Samuel Stebbins, by whom the bond of indemnity was procured to be executed on the 14th of Sept., 1838; and Niles insists that that bond released him from all responsibility on account of the titles to any of said lands. He denies that he ever induced the defendants to believe any thing, in regard to the condition of the titles to said seven sections, at variance with the existing state of facts; and insists that if they have been mistaken at all, (which he denies,) their mistake was not one of fact, but a mistake of law, against which they cannot be relieved. He admits that the Indian deeds to him for the seven sections have never been approved by the President, but alleges that the Indians were all respectively located upon the lands mentioned in their deeds, and were clothed with the legal title; that he paid the purchase-money to the Indians, and thus acquired a perfect equitable title, which passed by his conveyance to Stebbins. He insists that it was the duty of the defendants to procure the approval of the President upon said deeds; that they have never tried to procure it, and that he knows of no reason why the deeds should or would not now be approved, if submitted for that purpose. He denies the allegation of fraud in regard to the conveyance of "refuse lands" to Samuel Stebbins, and

asserts that the lands in question were conveyed by him in good faith, under the circumstances before stated; states that these are not "refuse," but choice lands, averaging more than $5 per acre in value, and that the prices at which they have recently been entered afford no criterion of their value, because the persons entering them must have known that they acquired no titles. Demurs to the cross-bill, upon two grounds:

1st. Because Samuel Stebbins is not made a party thereto; and,

2d. Because the relief sought by the cross-bill is not cognizable in equity, but is purely a matter of legal cognizance, in an action at law upon the warranty of title to Stebbins.

The court decreed in favor of plaintiff, (Niles,) and defendants prayed the writ of error.

*Watson* and *Craft*, for appellants.

The contract consists of the letter of instructions to S. Stebbins of the date of April 1, 1835.

The contract, thus reduced to writing, is to be read by the light of surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties; but as they have constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it, nor substituted in its stead. 1 Greenl. Evid. § 277; 2 Leigh, (Va.) R. 630; 11 Verm. 549; 1 Kelly, 12.

It will be seen, that under date of January 23, 1835, complainant addressed a communication to S. Stebbins, containing a proposition from him, the result of which was the contract finally made.

In this communication, complainant says: "Referring to the conversation of last evening, I would remark, that I hold fifty sections or thirty-two thousand acres of land in the recently acquired country of the Chickasaws." He further says: "About thirty sections are already located, and the balance will be, immediately on my return to the country;" "that he had made but one payment on each purchase of six hundred and forty acres; that he should be compelled to make the balance of his payments within four months, and being under the necessity of raising the money for the balance unpaid,

would be willing to dispose of such proportion as would enable him to meet his engagements, at $5 per acre, but would by all means prefer giving an interest of one third of the whole speculation to any party that would advance the cost of the lands, as he was convinced it would be more to his interest, than to part with an acre at the price named, — the expenses attending locations and sales to be borne *pro rata*, his own services gratis." He then adds:—

" I value none of the lands at less than $10 the acre, and much of it at still a greater price, at which I believe it may be closed, at less than eighteen months. This done, I should wish to hold the balance for a still higher price. The security to the party would be the money advanced, placed in your hands, and to be paid out on the government titles, at the rate of $1,000, as handed over."

The offer here made, is to sell lands, to be paid for as the government titles were received. It will be seen, that strong assurances were given that the lands offered were the choice lands of the Chickasaw nation, and the proposed speculation was represented as a truly magnificent one.

The proposition to sell was in the alternative; that is, at the price of $5 per acre, or an interest of one third in the speculation, at the price of $1,000 per section, and the payment by the purchaser of one third of all expense attending the survey and location of the lands, except, that for the personal services of complainant nothing was asked.

Had the first of these propositions been acceded to, it would have been but the ordinary case of the sale and purchase of lands at $5 per acre, and had the second been accepted, the defendants would have paid $1,000 per section for an interest of one third in the fifty sections of land which complainant states he owned, in addition to the bearing by defendants of one third of the expenses attending surveys, locations, &c.

This reference to the expense of surveys, locations, &c., it is confidently believed, is connected only with the alternative offer, so that had the first offer stated been accepted by defendants, they would have been chargeable with no portion of the cost of the lands to complainant; but, be this as it may, de-

fendants make to complainant a distinct and substantive proposition, perfect within itself, and excluding all reference to the offer complainant had made. By the terms offered by complainant, it was not proposed to divide the profits after first reimbursing to defendants their original outlay. For illustration, had defendants accepted the alternative offer, on the sale at this date of a section of the land, one third of the proceeds thereof would have fallen to defendants, and to this alone they would have looked for the reimbursement of their outlay, as well as for their profits; consequently, this would have been the result. Suppose the sale effected at the price of $3,600, — of this sum defendants would have received $1,200, and the complainant the remaining $2,400.

. Defendants, however, seeing that complainant must have funds, and that he believed an immense fortune was at stake in commanding funds, without the slightest reference to the terms which had been offered, say in reply to Mr. Stebbins: —

" You may close the matter with Mr. Niles, (complainant,) on the following terms: —

" 1st. Mr. Niles to attend to the survey and location of said fifty sections of land, and take the warrants or titles in your own name, in trust for the parties concerned, and you are to pay said Niles $1,000 for each title or warrant for six hundred and forty acres so received by you, to the extent of the fifty sections and no more.

" 2d. Niles is also to attend to the business of selling said lands in behalf of all the parties interested, under your authority, and moneys received on account of sales made, to be received by you at the time of conveyance, and to be applied to the repayment to the parties of the $50,000 hereby advanced, with interest on same, until the whole be refunded. And all the proceeds which may arise from the said lands, over and above the said $50,000, and interest thereon, to be divided, say one third to said Niles, and two thirds to the parties to this agreement *pro rata* according to the amount advanced by each respectively."

The above two sections of the letter of instructions, embrace the offer made by defendants to complainant. The

remaining sections were directory as to other matters. It is evident, that from the extravagant representations of complainant, defendants believed that the lands would readily command $10 or $15 per acre, but at the same time, as they wished promptly to be reimbursed their outlay, they were willing, with a view to that object, to sell a portion of the lands at $5 per acre; the remainder, however, to be held at $10 or $15 per acre; and accordingly they instructed Mr. Stebbins to this effect.

The offer made by defendants was accepted by complainant; "circumstances," as he says, "compelling him to accede to the proposal, rather than forego the speculation." And then, the next day or the day after, complainant having in the meantime been furnished with a copy of the letter of instructions, he formally accepts the offer which had been made, in these terms: —

"Referring to and confirming my note of Friday last, on the subject of the Chickasaw lands, I would remark, that the terms acceded to by me are strictly in conformity with instructions received by you, as far as I had the opportunity of judging by your 'extracts' as furnished."

Complainant, in the same communication, goes on to state the reasons which had compelled him to make this great sacrifice, as he terms it. And Mr. Mead, one of the purchasers, attributing doubtless much importance to the choice selections which complainant represented he had made of the lands sold, having, through Mr. Stebbins, said to complainant: —

"In regard to the titles, if I am not misinformed, they cannot be secured until the surveys have been made by the surveyor-general of the United States, and the locations approved by the government. Now, if this be so, the question is, Can Mr. Niles bring the necessary influence to bear to obtain the confirmation of his locations by the commissioner? If he cannot, then his locations are of no consequence or benefit to the association, over those they could now have." Complainant says: —

"The priority of claim under the contract," (referring to his contract with the Indians,) "is a certain guaranty of title

from the government.   As evidence of the fact, thirty-four sections are local, being the permanent residence of the settler, that cannot be interfered with; the balance in floats, now in a train of location under the immediate eye of the agent himself."   Complainant further adds : " $500 has been offered me, for a mere transfer of my contracts, per section, say $25,000, and I declined of course, as I consider the whole purchase will average and realize $10 the acre.   At the same time, I am equally convinced, that sales to reimburse, pressed upon the market, will equal that sum; if so, the balance of the lands must produce from $15 to $20."   And then complainant proceeds : " Allow me again to repeat, that the above being the result, I feel a degree of confidence in the future liberality of the parties interested."

Now looking to the announcement by Mr. Niles, in his first written communication, that he held fifty sections, or thirty-two thousand acres of land in the recently acquired country of the Chickasaws, on which he was compelled to raise money, — that about thirty sections were then located, and the balance would be immediately upon his return to the country, — that the security which he offered was the money to be paid out on the government titles, — and to the offer of defendants to pay Mr. Niles $1,000 for each title or warrant for six hundred and forty acres, to be taken in the name of S. Stebbins, in trust for the parties concerned, to the extent of fifty sections and no more, — Mr. Niles to attend to the business of selling said lands, &c.

Mr. Niles himself had distinctly in his own mind, when he closed the contract, the distinction between the contract which he had made, and the sale by him of mere contracts with the Indians for land, when he said that " $500 advance had been offered him for a mere transfer of his contracts, per section, say $25,000."   Here " the mere transfer of his contracts," was contrasted by him with what he had actually done; that is, with the sale which he had made of so much land, to be paid for as titles were vested in Samuel Stebbins.

The operative and substantive words of the contract closed, are, " title or warrant; " and these terms are free from all am-

biguity. The titles or warrants were to be taken in the name of S. Stebbins, and for each title or warrant for six hundred and forty acres so received by S. Stebbins, he was to pay $1,000, to the extent of fifty sections and no more.

By the " title," to be thus vested in S. Stebbins, was certainly intended by the parties every thing necessary to enable them to enjoy the land. 2 Black. 195–197. And the term " warrant," when applied to lands, is thus defined : " A warrant issued at the local land offices of the United States, to purchasers of public lands, on the surrender of which, at the general land office, in Washington city, they receive a conveyance from the government." Webster's Dict.

Now, in view of all this, it is respectfully submitted, that defendants contracted for, and that complainant sold defendants, not Indian contracts for land, but fifty sections of land ; and that in conveying these fifty sections to Stebbins, the defendants were entitled, either to the title of the government, or the deed of complainant with covenants of general warranty. And this view of the subject is certainly strengthened, if indeed it need be strengthened, by the highest authority.

In *Carpenter* v. *Bailey*, 17 Wend. 247, the court says : " It was the title to the premises which the defendant stipulated for, not a piece of parchment, good in form, but waste paper in effect, for the purpose of transferring the title."

And in *Greenwood* v. *Ligon*, 10 S. & M. 615, the court quote with approbation what is said in the case of *Gray & Reader* v. *Darby's Lessee*, Mart. & Yerg. 403. " The legislature, by the term ' grant,' meant the land covered by the grant, and not merely a paper purporting to be a patent." 22 Pick. 166, 172 ; 11 Verm. 549.

And so in this case, when defendants contracted for " titles or warrants " to fifty sections of land, they had a right to demand fifty sections of land, free from all cost, charge, or incumbrance, save the $50,000 which they had contracted to pay, and the interest in the profits, which by the contract was reserved to complainant.

To sustain complainant's view of the contract, it must be

held, that the proposition to sell an interest of one third of the whole speculation, to any party that would advance the cost of the land, which had been stated to be $1,000 per section, and who would agree that " the expenses attending locations and sales should be borne *pro rata*," constitutes a part of it.

Strike this stipulation out of the correspondence, and the true construction of the contract, on this point, ceases to be an open question. Aware of this fact, complainant inquires of Stebbins, the agent of the defendants in closing the contract, " if there was any understanding or stipulation between them, that the clause in his proposition, providing that the expenses attending location and sales should be borne *pro rata*, should be excluded," and " whether or not he, Stebbins, was instructed to make, or did attempt to make, any further change in complainant's original proposition, beyond that of reducing complainant's interest from two thirds to one third."

This is an attempt to vary the written contract by parol contemporaneous evidence, which cannot be done. 1 Greenl. Evid. § 277; 2 Leigh, 630.

The witness, however, properly replies to these inquiries by a reference to the articles of agreement and letter of instructions, which contain the offer of himself and his associates to complainant, and which were agreed to by complainant, in writing. These writings constitute the contract, now the subject of construction, and they certainly, in terms, preclude all reference to any other paper of a previous date.

The contract thus made and concluded, is in itself perfect. In consideration of the $50,000, complainant agrees " to attend to the survey and location of the fifty sections of land, with the titles or warrants to which Stebbins was to be invested, in trust for the parties concerned," and that he was only to receive the purchase-money " for each title or warrant for six hundred and forty acres" when the same, that is, the title or warrant, was received by Stebbins. As a part of his undertaking by the contract, complainant is also to attend to the business of selling said lands, and to suffer all moneys received on account of sales made, to be applied to the repayment to the parties of the $50,000 advanced, with interest on same,

until the whole be refunded; after which, the proceeds which might still arise from the lands were to be divided, one third to complainant, and two thirds to defendants.

Now it is apparent, that it was understood by both parties to the contract, that the whole of the fifty sections of land were charged by it with the entire outlay of defendants; but this will not now be done, if it is held, that as a part of the price which defendants agreed to give for the said lands, they were to pay, in addition to the $50,000, any part of the cost of the lands to complainant. For the refunding of any such element of cost to defendants, the contract makes no provision. To require defendants to pay two thirds of the expenses incurred by complainant in making his locations, all of which preceded the vesting of titles in Stebbins, would be interpolating upon the contract, by construction, a material and substantive clause. As for the expense attending sales, but a single section had been disposed of prior to September, 1838, when the expense account rendered amounted to $8,829.30.

Defendants had a right to the services of complainant in making sales, because he stipulated to render them, as a part of his undertaking by the contract.

It is not in proof, that complainant paid to the Indians $1,000 per section for the lands. In endeavoring to effect a contract with defendants, he represents this to have been the fact; but that this representation was untrue, is shown by the recital in one of the Indian deeds to complainant of $800 as the sum paid by him for the section conveyed, and which is one of the fifty sections conveyed to Stebbins.

What complainant may have paid for the remaining forty-nine sections, does not appear in proof; but that $1,000 per section afforded him a handsome profit upon original cost and incidental expenses combined, is by no means an unreasonable supposition.

The contract really made by complainant, in view of the facts of the case, was at the time by no means an unreasonable one; he was compelled to raise money, or to abandon what he regarded as a most magnificent speculation. His own language as to his need was "being under the necessity of raising

money for," &c.   And as to the magnitude of the operation, his opinion of it is clearly shown by his declaration, that he " valued none of the land at less than $10 the acre, and much of it at a still greater price," at which he believed it (that is, the speculation,) might be closed at less than eighteen months. Complainant also informed defendants, that he had refused an offer of $500 advance per·section for a mere transfer of his contracts, and that he was convinced, that sales to reimburse, pressed upon the market, would equal that sum, and that the balance of the land would produce from $15 to $20 per acre.

Had these confident anticipations been realized, the speculation, on the part of complainant, would have made him an immense fortune.   Sales readily made at even $10 per acre, would have reimbursed the $50,000, and all other expenses connected with the lands, and have left to complainant a net profit of not less than $50,000 or $75,000.

Defendants, then, regard it as clear, that under their contract complainant was bound to them for fifty sections of land, and that when titles thereto were vested in Stebbins, in trust for them, they were bound to pay complainant $1,000 per section; and that on the sales of said lands, they had a right to be reimbursed the $50,000, so paid by them, with interest; and this being done, and all necessary charges upon the land, from the time the titles thereto were vested in Stebbins, being paid, then the net profits accruing from the speculation were to be divided between complainant and defendants, in the proportion of one third to the former, and two thirds to the latter.

Secondly. — The defendants contracted for the purchase of lands, to be paid for as titles, were perfected in Stebbins, and they were to pay for the lands the stipulated price of $1,000 per section, without reference to the cost of the lands to complainant.

The defendants concluded their purchase in the year 1835, but no titles were vested in Stebbins before 1836, at which time they fully paid the entire purchase-money, to wit, $50,000. Stebbins establishes this payment to have been " as follows: $5,000 February 11, 1836; $20,000 March 20, 1836; $5,000 in an acceptance of complainant's draft, 2d April, 1836, paid June

4, 1836; $10,000 on draft accepted June 6, 1836, and paid August 22d following; and $10,000 paid on complainant's draft, 28th September, 1836."

The mere ownership of the fifty sections of land was attended with no expense; no taxes were to be paid under the act of Congress until the lapse of five years after the titles passed out of the Indians; the services of Mr. Niles, in attending to the survey and location of the lands, and his attention to the business of selling said lands, were stipulated for, and due, as well as the lands themselves, in consideration of the payment of $50,000, and the one third of the profits accruing from the sale of the lands, after reimbursing the defendants their outlay, with interest upon it. The defendants were moved to the purchase by the belief created by complainant that the fifty sections of land were to be the choice lands of the Chickasaw country, thirty or more of the sections being, as complainant said, "located," and the remaining sections then being in the process of location, under the most favorable circumstances. The confirmation of these select locations was surely a desirable object, and hence the stipulation for the attention of complainant to this subject. Complainant resided in the Chickasaw country, and was compelled, irrespective of this speculation, to incur and defray the expenses incident to his own support and business. Prior to the 10th of September, 1838, but one of the fifty sections of land had been sold.

Under these circumstances, it is impossible that by the 10th of September, 1838, the defendants, on account of these lands, were legitimately chargeable with the sum of $8,829.30; and when viewed in connection with the true construction of the contract between defendants and complainant, the gross injustice of the attempted charge becomes apparent.

Whether or not complainant sustained to the defendants, under the contract, the relation of partner, he certainly was, by the contract, constituted their agent for the sale of the fifty sections of land; and as agent, it was his duty to keep the accounts of his principals in a clear and business like manner, unmingled with his own private or personal matters or general business. Paley on Agency, 478; 1 Story, Eq. § 469; Story

on Agency, § 332. If a party having charge of the property or business of others, so confounds it with his own, that the line of distinction cannot be traced, all the inconvenience of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or business, or suffer the loss. Story on Agency, § 333; Paley on Agency, 48, note 2, and authorities therein cited; 5 Ves. 485; 8 Ib. 863; 11 Ib. 358; 2 Johns. Ch. R. 108; 2 Daniel, Ch. Prac. 764.

The defendants are met by the averment, that by their acquiescence, the item of $8,829.30 had become an " account stated," and consequently, that complainant was relieved from the burden of sustaining it by proof. And it may be, that it will be insisted, that the defendants have not in their pleadings specified errors with sufficient distinctness, in what is said to be a " stated account." The rule on this subject is founded in the obvious injustice of permitting the party to come at the hearing with proofs of error, of which his adversary has heard nothing, and could not, therefore, be prepared to meet. 3 How. Miss. 357; 7 Paige, 573; 1 Daniel, Ch. Prac. 424. In most of the cases, this question has come before the court upon demurrer to a bill filed to open a stated account. 1 Daniel, Ch. Prac. 425. But in any event, after an account has been ordered and taken, it is too late to raise a question of this character. See the case of *Sugart* v. *Thompson's Heirs*, 10 Leigh, 434, 443, 444. In this case, the bill specified particular items as errors in the account; these specifications were met in the answer by explicit denials, and no proof has been taken sustaining them; still an account was ordered. Before the commissioner, no one of the specifications was sustained; but other items in the account were shown by proof to be erroneous, and to this extent relief was afforded the plaintiff. In the opinion of the high court, the reference for an account was irregularly made; but having been made, and the testimony disclosing errors not specified in the pleadings, it was now proper for an amendment of the bill to have been allowed, or for the relief to be afforded the plaintiff, which the decree gave. Stanard, J., delivering the opinion of the court, says : " It was within the competency of the court to take the latter course.

25 *

Such a practice seems to me recommended by many considerations. It is more compendious and less expensive, and tends to prevent or shorten those delays in the administration of justice, which are grievances admitted by all, and by many urged as a reproach to its ministers. Every object of the more formal proceeding, and every privilege of defence it would afford, may be attained under this more summary practice." 10 Leigh, 443, 444.

In this case, complainant had full notice of the defence relied upon, in reference to the item in question. Defendants in their answer say, that the complainant in his account "charged said association, on the first of March, 1838, with the sum of $8,829.30, without having delivered to said association, or its agents, any account of the particulars which said aggregate item embraced, and without having expended on account of said association, as respondents believe, any such sum." Said item, respondents allege, "consists mainly of charges, for which complainant was personally responsible, for pretended services; for hire of an office by complainant, occupied in his general business, including possibly some money."

These specifications are made in addition to the general denials previously quoted from the answer, and the reiterated declaration of the answer, that the said item of $8,829.30 was unjust, and to no extent chargeable upon defendants.

The rule is, that if one item of objection is sustained, the whole account is open before the commissioner for surcharge and falsification. 12 Leigh, 191; 3 Mass. R. 357.

Now, under this rule, defendants certainly have fully opened the item of $8,829.30, alleged to be a "stated account." Upon complainant's own admission, this item is successfully surcharged. If the expenses of location and sales, or, to be more definite, if the charges of which this item is made up, are properly chargeable upon the fifty sections of land, or upon the defendants personally, it is but two thirds of the amount, instead of the whole of it, that should stand as a debit against defendants. Complainant debits the whole amount, but the commissioner has properly reduced it one third; and to this reduction complainant has taken no exception; and if, too,

defendants are to be charged with their *pro rata* share of this expense account, upon the ground that complainant's letter to Stebbins, proposing to sell an interest in his lands or speculation, is to be taken as a part of the original contract, then the same letter stipulates for his services "gratis," a stipulation which has been widely departed from in the charges for office rent, for complainant's board, &c. Defendants do, it is true, assert a right to the services of complainant as rendered, but it is under stipulations contained in the contract made, and not in his original proposition.

Thus, even conceding that the item of $8,829.30 had become a "stated account," the right of defendants to surcharge and falsify it generally, is unquestionable; and the liberty to surcharge and falsify, includes not only an examination of errors of fact, but of law. 1 Story, Eq. § 524; 2 Daniel, Ch. Prac. 765, 766; 2 Atk. 112; 1 Wheat. 256. On this principle it was, at least, the duty of the court, if not of the commissioner, to have disallowed wholly the item in question; to its disallowance, nothing is necessary but a just and reasonable construction of the original contract.

But, finally, under this head, it is not true in point of fact, that the account, amounting to $8,829.30, had become a stated account.

Complainant does indeed earnestly invoke the benefit of the principle of a "stated account," and among other things, he says: "That he was surprised to find the defendants, or those representing them, in 1844, disposed to raise a variety of objections to the items of his account, and to require the production of vouchers and proofs in relation to matters long before stated and settled, and which they well knew it was not in the power of complainant then to produce."

This charge is certainly a novel one; complainant does not allege that his inability to produce vouchers and proofs was the result of his absence from home, or that they had been mislaid, lost, or destroyed; nor does he undertake to explain how defendants knew that he could not produce vouchers and proofs, which, as he implies, once had an existence.

This pretext may have been plausible if made in New York,

but it has now certainly ceased to be so.  The witness, Mr. Jagger, says, "that he frequently heard defendant express his entire confidence in the illegality of the whole proceedings, (of compromise in New York,) and his ability to right himself on his return to Mississippi, where he had papers and vouchers that would enable him to do so."

Complainant's bill was drawn at home, and for his convenience the commissioner repaired to his residence to take the account first ordered; and still, in reference to the items making up the aggregate of $8,829.30, there is not a voucher filed or alluded to in any way; nor is there one scintilla of actual proof, tending to show that complainant ever did incur or pay the said charges, or either one of them.

" A stated account properly exists only where accounts have been examined, and the balance admitted as a true balance between the parties, without having been paid."  Story's Eq. Pl. § 798; 2 Dan. Ch. Pr. 761, and note.

An account stated, is "an agreement between both parties that all the articles are true."  2 How. Miss. R. 786.

" The mere fact of the delivery of an account, without evidence of acquiescence, does not afford sufficient legal presumption of settlement."  1 Sim. & Stu. 333.

By the supreme court of the United States, this principle is thus stated:  " The mere rendering an account does not make it a stated account; but if the other party receive it, admits the correctness of the items, claims the balance, or offers to pay it, as it may be in his favor or against him, then it becomes a stated account."  12 Pet. 301, 335.

See, also, the very able dissenting opinion of Allen, J.  12 Leigh, 195-199; 6 Alabama, R. 438.

Now, what are the facts in this case?  The answer of defendants, in direct response to the charges of the bill, "denies that the defendants at any time approved or sanctioned complainant's expense account, or assumed the payment of it, or any portion of it," and alleges the truth to be, " that the said expense account was presented by the complainant to the said association (of defendants) in September, 1838, but was withdrawn by complainant on his perceiving the little favor with

which it was regarded, and the determination of the association to disallow it; and, moreover, the complainant, on this occasion, did not pretend to claim the allowance of said account as a matter of right, but stated, in substance, that the operation out of which said account had grown, would, he had no doubt, turn out so very favorably, that he thought the account ought not to be resisted." Respondents also say, " that no allusion was made to said account in the record made of the proceedings of said meeting, because, in the opinion of said meeting, said account was a matter with which it had nothing whatever to do."

It will be seen that Mr. Niles made to the meeting " a general statement of his operations in behalf of his purchases, character of titles which he exhibited, description of the lands, and statement of their estimated value, together with his opinion with regard to contemplated sales, exhibiting maps and surveys of the land belonging to the company, and explaining such matters as required elucidation, which was considered satisfactory by all the gentlemen present."

Now, the answer of defendants, as to admissions or acquiescence by them, in relation to this account, being directly responsive to, and explicitly denying the allegations of the bill, which is not sworn to, can only be overthrown by two witnesses, or one witness and corroborating circumstances. But even more than this, the complainant, having in his bill made the several allegations, which, if true, constituted the account in question a stated account, calls upon the defendants to " answer the same, as fully and particularly as if they were separately interrogated, as to the several matters and things stated " in the bill. Under these circumstances, the answer not only throws the burden of proof on complainant, but is good evidence for defendants. 6 S. & M. 647, 711; 7 Ib. 16; 13 Ib. 65, 74.

Looking to the state of the pleadings in the case, it certainly devolved upon complainant to sustain, by satisfactory proof, those allegations in his bill which are relied upon to constitute the alleged expense account a " stated account."

So far, however, from finding in the case this necessary proof

on the part of the complainant, the testimony, it is submitted, is all the other way.

The first intimation made by the complainant of the expense account, is contained in a letter from him to Stebbins, of the date of March 31, 1838. He here says: " The balance against me in favor of R. Stebbins & Co. I am anxious to cancel, which corresponds, no doubt, with your wishes. Why cannot I make the expenses here, chargeable to the association, and for which I am in advance, available to that end ? Mr. Low, when here, assured me that they should be forthcoming; it would certainly be northern funds to you. Let me have your opinion on the subject." .

At this time, no expense account had been presented to Stebbins, or to either one of the defendants; consequently, Mr. Stebbins must have been ignorant as to the character and amount of the account to which complainant had referred.

In reply to this letter, Mr. Stebbins most carefully guards against any admission, express or implied, of the justice of complainant's claim. He only says, " when I see you again, we can have some conversation in relation to your demand on the Niles association, its proposed application, &c. At present I deem it unnecessary to say more on this subject, as it is very possible that you may have left Pontotoc before this will reach there. Should, however, your stay there be prolonged to the 15th June, I shall either see you there, or at some other point, to be hereafter agreed on. In the meantime, if you should not conclude to go with me to New York, you will oblige me by having matters in relation to the association in such a state as that I may be able to receive them, and submit them to the parties interested, in compliance with their expectations."

Now, in this letter, which is dated May 24, 1838, so far from admitting the claim of the complainant, its consideration is expressly deferred to a future time, and the right of the association (the defendants) to pass upon it, is distinctly brought to view.

An account, after having been expressly denied and disallowed by the party alleged to be chargeable with it, cannot be legally established by doubtful proofs of subsequent admissions,

to be inferred from the acquiescence of such party.   Acquiescence, to have the effect of an admission, must exhibit some act of the mind.   1 Greenl. Evid. § 197; 1 S. & M. 444, 487–489.

Had this account of $8,829.30 been examined and 'admitted by defendants, as a true balance against them, prior to August, 1844?   Story, Eq. Pl. § 7, 8, 9; 2 Dan. Ch. Pr. 761, note 8. Had there been an agreement between both parties, that the items composing it were true?   2 How. Miss. R. 786; 12 Pet. 301, 335; 12 Lee, 195–199.

Courts of equity properly watch with extreme jealousy all contracts made by a party while under arrest or imprisonment, and if there is the slightest ground to suspect oppression or imposition in such cases, they will set aside the contract.   1 Story, Eq. § 235, 251; Chitty on Contracts, 307; 5 Hill, 158; 6 Mass. 506; 16 Pet. 279.

.  Complainant was certainly the agent of defendants for the sale of the lands.   Whatever may have been his interest in the lands, he had contracted to sell them " under the authority and instructions of Samuel Stebbins," trustee, &c.   " As between Samuel Stebbins and the defendants, his associates, it was agreed that Walter Mead, Russell Stebbins, and James Treat, should have authority to correspond with him or complainant, and give such instructions and receive such communication, as might from time to time be required; the said Mead, R. Stebbins, and Treat, always consulting their associates, when practicable, and when not practicable, to assume the direction of the business."   Complainant then, when he reached New York, in the summer of 1844, was under the authority and direction of defendants, by the terms of his contract; and by the express stipulation of all the parties concerned, all moneys received on account of sales were to be received by Samuel Stebbins, to be applied by him to the repayment to defendants, of the $50,000 advanced by them, with interest.   Complainant had been permitted, however, to receive on account of sales, $21,983.58; of this sum he had paid over but $12,500, leaving in his hands $8,483.38.   The retention of this sum by complainant was placed by him on the ground of the liability of the defendants

to him for the $9,829.30 expense account, as well as for other charges of a similar character. This position assumed by complainant, was wholly indefensible, if our view of the original contract be correct. Complainant also had in his hands, on account of the sale of lands, $28,804.74, in choses in action. These, too, he refused to surrender to defendants, contrary to his duty as agent, and in violation of the rights of defendants, not only as his principals, but under the terms of the contract existing between the parties. As to these choses in action, the witness, Storrow, expressly testifies that complainant refused to give them up.

For the effect of the want of the approval of the president, or his agent, to the deeds, see 5 How. 365; 10 S. & M. 540; 12 Ib. 425.

As to the demurrer to the cross-bill for the want of proper parties, it is denied, that all proper parties are not before the court. This ground of demurrer too, when well taken, usually leads to nothing more than an amendment of the bill. Story's Eq. Pl. §§ 74, 228, 229, 231, 236.

As to the second ground of demurrer, "that the relief prayed for in the cross-bill, is purely a matter of legal cognizance in an action at law against complainant, upon his warranty of title," defendants insist, that whilst this is true as a general proposition, it is not the law in cases in which the vendee has never been put in possession of the subject of the purchase, or where a fraud has been perpetrated by the vendor. 7 S. & M. 256; 4 How. 435; 5 Ib. 272, 542; 9 S. & M. 596; 13 Ib. 580; 11 Ib. 109.

Defendants were never put in possession of these seven sections of land; defendants always have been non-residents of the State. That they were put in possession, is not even averred by complainant; and as the legal title never passed out of the government or the Indians, (and it does not appear, that the Indians, whose imperfect deeds were procured, were entitled to reservations,) the deeds from complainant to Stebbins, did not even give Stebbins constructive possession.

And, moreover, it is insisted that the charge of fraud is sustained. In negotiating the sale in January, 1836, complainant

says, " About thirty sections are already located, and the balance will be immediately on my return to the country," " and that the choicest lands out of the whole nation will be reserved in locations, ere the government proceed to sell." Complainant also makes the most extravagant representations as to the value of the land he proposes to sell; none of it, he declares, " being worth less than $10 the acre, and much of it a still greater price."

Now, in the consummation of the sale made, complainant acted as the agent of the defendants. In the transaction, he sustained, indeed, the double relation of vendor and agent for the vendees. 7 Black. 178; 2 Wheat. 178; 2 Rob. Va. R. 292, 302. As usual in such cases, that he sacrified his duty to his interest, is most obviously true.

The letter from Mead to Stebbins, which was laid before complainant, shows the importance attached by defendants to complainant's alleged select locations. But upon this subject, what are the facts? Prior to the year 1837, complainant had not vested in Stebbins for the association titles to more than twenty-five or twenty-six sections of land; and thereafter, if at all, the remaining sections conveyed were located; as to the seven sections, 11, 12, and 13, T. 8, R. 10, 31 and 32 T. 4, R. 9, 34 and 35, T. 10, R. 6, they were not attempted to be conveyed to Stebbins until the month of September, 1838, and the reason why they were not earlier conveyed, was that they had not been earlier located; and long ere this, as early indeed as the spring of 1836, as the court will judicially know, the public sale of the Chickasaw lands commenced.

It is also agreed that the statements of the Commissioner of the general land office, Richard M. Young, as to the seven foregoing sections, included in the cross-bill, shall be taken as evidence; and these statements prove, that these seven sections of land were not sold publicly, or entered, until the years 1845–1848, and that they were then disposed of, at an average of about thirty-five cents the acre.

These lands all remained unsold, until by the law graduating the price of the lands in the Chickasaw nation, they were re-

duced to the low price stated; such was not the fate of the choice lands of the Chickasaw cession.

In reference to quality, therefore, the charge of fraud we regard as abundantly sustained. 7 Blackf. 178; 2 Wheat. 178, 195; 3 Story, 659, 700; 4 How. 435; 1 Story, Eq. §§ 193, 194; 9 S. & M. 16; 2 Robin. Va. R. 292, 302; 7 Blackf. 183; 6 How. 309–312; 1 Robin. 298.

Complainant refused to give up the Indian deeds.

This refusal has reference evidently to the deeds exhibited by complainant at the meeting in New York in September, 1838, and which are the very deeds subsequently found to be defective. These deeds, it will be seen, were produced by complainant, on the examination of the witness R. E. Orne, and filed, as exhibits 3, 4, 5, 6, 7; and 8, to his deposition. Two of these deeds bear date June 5th, 1838, and the other four, one day thereafter; and as proof of the imposition practised by complainant, in the expose made by him of his titles at the meeting in September, 1838, it will be seen that these six deeds were all, at that time, without the requisite certificate of the two chiefs and the Indian agent, as well as without the president's approval. It was not until June, 1839, that any attempt was made to have these deeds authenticated, and then the authentication was left imperfect, for the want of the president's approval.

It is agreed that the Indian deed for sect. 12, T. 8, R. 10 west, is in all respects similar to the foregoing six deeds.

Complainant was familiar with the subject of land titles in the Chickasaw nation. On this subject, he was confided in by the defendants, as their agent; and in making an exhibit of titles to the association, at the meeting in New York, on the 10th of September, 1838, he must have known that the titles to the seven sections in question were defective, whilst it does not appear that this fact was disclosed to defendants, or was by them discovered or known; and it was to guard against just such a case, of imposition as to title, that defendants deemed it necessary to have the covenants of general warranty by complainant which are contained in his deeds. And these deeds containing these covenants, not having passed the title, com-

plainant has not complied with his original contract. 10 S. & M. 615; 13 Ibid. 275; 6 Leigh, 259.

The defect of title, the absence of possession by the vendees, and fraud, having been clearly shown, the case, it is respectfully submitted, is a proper one for the rescission of the contract, as to the seven sections, without title; unless defendants, by their delay or acquiescence, or by their own act in some other way, have precluded themselves from this relief.

In one of its aspects, complainant's original bill is a bill for specific execution as to the $500 claimed to be still due from defendants on account of the original purchase-money, which they contracted to pay complainant.

Defendants deny that this, or any balance, is unpaid of the said purchase-money.

But, conceding the amount claimed as purchase-money to be due, it is insisted, that complainant has not shown himself entitled to the specific execution which he asks. The want of title, as to the seven sections, presents an insuperable barrier to a decree *for specific execution.* There is an implied warranty in every sale, made without explanation, that the vendor is able to do what he contracts to do; and a vendor, greatly in default, will not be aided by a court of equity. This principle is thus clearly stated by Chief Justice Marshall: "Both on principle and authority, I think it very clear, that a specific performance will not be decreed on the application of the vendor, unless his ability to make such a title as he has agreed to make be unquestionable." 6 Call, 368; 9 S. & M. 596, 609. In this case, the complainant has neither the ability nor inclination to comply with his contract.

The delay in seeking this rescission, in part, of the original contract, is sufficiently accounted for by the circumstances of the case.

Until October, 1844, defendants confided in complainant, as to the titles to the lands, and from his own fault, in keeping them in ignorance of the true condition of things, he will not now be permitted to reap an advantage; when his agency ceased, and the compromise was made, he represented, and renewedly guarantied, " that the thirty-nine sections of land, then

remaining unsold, were still vested in Samuel Stebbins." And he agreed, that the titles to the seven sections which were allotted to him, should be held by said Stebbins until it could be ascertained that his representations as to titles were correct. By the last of the ensuing August, complainant was notified of the want of title to six of the thirty-nine sections.

Under the circumstances, the delay in making the discovery, as to the defect in some of the titles, was not unreasonable.

After this, defendants, holding in their own hands a security for the defective titles, did all that it was necessary for them to do, in requiring of complainant, August 21, 1845, "that he make these defective titles perfectly good, or otherwise refund the association the purchase-money paid him, and the legal interest on the same." By agreement, seven sections are to be regarded as in the same condition.

This whole subject always addresses itself to the discretion of the court, and time is deemed material or not, as it may affect the justice and equity of the case. 6 B. Mon. 40, 120, 222; 7 Blackf. 178, 227.

If the foregoing views be sustained, no decree can be rendered in favor of complainant. Whether the compromise be sustained or set aside, the result will be the same. If sustained, the defendants on their cross-bill have a right to a decree against complainant for the purchase-money paid him for the seven sections to which the titles are defective, with interest thereon, from the time of payment of the money; and to the payment of this sum, the seven sections drawn by complainant under the compromise should be subjected. By the terms of the compromise, the titles to these sections were to be retained by Stebbins for defendants, as an indemnity against loss resulting to them from any mistake or misrepresentation on the part of complainant, in the statements on his part, upon which said compromise was based.

Should the compromise be set aside, the bill of complainant should be dismissed, on the ground that defendants had not been reimbursed their original outlay for the lands; and that, until this was done, complainant had no rights as against them; and at the election of defendants in this event, relief should or

should not be granted to them on their cross-bill. Defendants might well prefer the seven sections of land, with defective titles thereto, to a decree against complainant for the purchase-money paid for them and interest, unless it can be seen how this decree is to be paid or satisfied by complainant.

*J. W. Clapp,* on the same side, filed an elaborate written argument.

, *Stearns* and *Harris,* for appellee.

The counsel for the defendants contend, that the contract consists solely of the letter of instructions to Samuel Stebbins, and Niles's note of acceptance. Can this be so? Take the two together, without reference to the original proposition of Niles, and try to make a contract out of them in regard to Chickasaw lands. The attempt is fruitless. The letter of instructions, considered by itself, is unintelligible. It may relate to lands anywhere. Certainly, it has no reference to Chickasaw lands. Upon its face, it is void for uncertainty. It requires too much explanation. The gentlemen are thus driven back upon the original proposition, but they say they go there merely "to read the contract under the light of surrounding circumstances." We insist, also, that the original proposition of Niles is part and parcel of the contract between him and the association, and that it is still operative throughout, except so far as its terms have been altered by the letter of instructions; that it is now the contract, in fact, save only in those respects wherein it is in direct and irreconcilable conflict with the letter of instructions.

Let us examine that proposition. Niles has contracted with various Chickasaw Indians for the purchase of their reservations, at $1,000 per section, to the extent of fifty sections. He has paid, perhaps, $5 to each Indian as "earnest money." He has not the funds necessary to meet his engagements with the Indians. He is satisfied that the speculation, if he can carry it out, will prove very profitable. In this emergency he meets with Samuel Stebbins. They converse upon the subject. At the suggestion of Samuel Stebbins, he "hastily throws to-

26 *

gether" a few remarks in relation to the proposed speculation, in order that Samuel may send them to his friends in New York, who are capitalists. He gives his candid and honest opinion in regard to the advantages likely to be derived from the speculation, and concludes with a proposition. He requires $50,000. He says to Samuel Stebbins: "If any one will furnish me with $50,000, I will do either of two things. 1st, I will repay the money in Chickasaw lands at $5 per acre; or 2d, I will give to the party furnishing the money an interest of one third in the speculation. The expenses attending locations and sales to be borne *pro rata* — my own services gratis. The security of the party advancing the money will be, the money advanced to be placed in your hands, and paid over to me at the rate of $1,000 per section, as the government titles are handed over to you."

Let us suppose that the second of these propositions had been accepted by the association without modification. What would then have been the respective rights of the parties to the contract? Clearly, as we conceive, Niles would have been entitled to two thirds, and the association to one third, of the profits of the speculation — each party paying their *pro rata* proportion of the expenses. To arrive at the amount of the profits, we have only to sell the lands; deduct from the proceeds the $50,000 and interest, and the residue is profits. There can be no profits until the $50,000 and interest is refunded. The expenses may be paid by the parties, when they occur, in the proportion of their respective interests in the speculation. If, however, they are advanced by Niles, he is entitled to be reimbursed out of the first moneys received from the sale of the lands. The expenses having been paid, the defendants are entitled to the whole of the proceeds of the sale of every section of land, until their $50,000 and interest thereon is refunded. Then as to the titles: Niles proposes that the "government titles" shall be placed in the hands of Stebbins, as a security for the party advancing the money, and that Stebbins shall pay him $1,000 per section for each section for which such a title shall be handed over. The letter of Niles, embracing the proposition, discloses the fact that he has con-

tracted for Indian reservations only.   To such lands there can
be, strictly speaking, no "government title."   Such title can be
acquired only by virtue of a direct purchase of land from the
government.   It was not contemplated that Niles was to make
any such purchases.   His proposition looks only to the fifty
sections of Indian reservations, for the purchase of which he
had already contracted.   Indian deeds, therefore, are all that
can be obtained by Niles, and must be held to meet the require-
ment of the proposition in regard to "government titles."
These deeds, — or rather, the titles to the lands, — are to be
held by Stebbins as a security for the repayment of the money
to the party advancing it; and he is to pay Niles $1,000 for
every such deed.   The question, whether Niles was bound to
furnish perfect titles, will be discussed hereafter.

This proposition of Niles having been submitted by Samuel
Stebbins to the association in New York, they took it under
*consideration*.   Niles says it is true, " I hold fifty sections, or
thirty-two thousand acres, of Chickasaw land."   He does not
pretend to own it, but proceeds to show how he holds it.   He
holds Indian contracts for it only.   He refers to the treaty; and
it is evident, from the very face of the proposition, that he did
not own a foot of the land.   The defendants never believed
that he did.   They did not contemplate a purchase from Niles,
but from the Indians.   In the agreement between themselves
they say : " Whereas, it has been proposed by T. N. Niles, to
make a purchase of fifty sections of Chickasaw land, at $1,000
per section, which said fifty sections have been contracted for
by said Niles," they agree to pay $5,000 each, and appoint
Samuel Stebbins as their agent, and he is " to apply the money
to the making of said purchase." ' In this agreement, they pro-
vide that they are to have two thirds of the profits, instead of
one third, as proposed by Niles.   Otherwise they indicate no
desire to modify any other feature of his proposition.

Next, the association draw up the letter of instructions to
Samuel Stebbins.   They say : " You will perceive from the
inclosed agreement that the $50,000, necessary to meet Mr.
Niles's proposition for fifty sections of land, has been made
up."   They then proceed : " you can, therefore, close the matter

with Mr. Niles, on the following terms." *In paraphrasis*, the intention of the writers of that letter was clearly this: " We accept the proposition of Mr. Niles, provided he will consent to the following modifications." In looking over the provisions of the letter of instructions, it may be useful to institute a parallel between them, and the provisions of the proposition of Niles. 1. " Niles is to attend to the survey and location of the land." He proposed to render his services " gratis." 2. " The titles or warrants are to be taken in the name of Samuel Stebbins, in trust for the parties concerned." Niles proposed to hand over to Stebbins the government titles, as a security for the party advancing the money. If the titles, or deeds, only, had been placed in the hands of Stebbins, it would have amounted merely to an equitable mortgage. The association, therefore, thought proper to provide that the titles should be taken to Stebbins, in order to remove what was, at least, an ambiguity in the proposition. 3. " You are to pay Niles $1,000 for each title or warrant so received by you." Niles proposed that the money should be placed in the hands of Stebbins, " to be paid out on the government titles, at the rate of $1,000, as handed over." 4. " Niles is to attend to the selling of the lands." He had, as before stated, proposed to render his services " gratis." But, 5. " He is to do this under the authority and instructions of Stebbins." He had not proposed to permit them to control him in his operations, and here was, therefore, an essential modification of his proposal. 6. " All moneys arising from sales are to be received by Stebbins at the time of conveyance." Here was another change. 7. " These moneys are to be applied, in the first instance, to the repayment of the $50,000, and the interest thereon." This, as we have seen, would have been the case under the original proposition; but, out of abundant caution, that was distinctly provided for, which otherwise would have rested merely in inference. 8. " After the $50,000 and interest is refunded, the proceeds of the lands are to be divided — one third to Niles, and two thirds to the association." He had proposed to give them one third. They here stipulate for two thirds. This was the great and essential modification of his proposal contemplated by the

association. 9. " They wish to sell lands, to reimburse themselves, at $5 per acre, and hold the residue at a higher rate." This was in accordance with a suggestion made by Niles in his proposition.

We have thus seen that the only material modification of the proposition of Niles, produced by the letter of instructions, was that which reduced his share of the profits to one third. The other changes were manifestly intended to give the association a power of control over Niles, which he had not proposed to confer upon them. Some provisions, also, were made, having evidently no other object than to render that clear and certain, which, upon the face of the proposition, was obscure or doubtful. Therefore, in the letter of instructions, it was unnecessary to stipulate that Niles's services should be rendered " gratis." That was already plain enough, for he had proposed it directly. It was equally unnecessary to stipulate that the expenses should be borne *pro rata*, although the proposed share of Niles in the profits was reduced; because, inasmuch as the expenses must be deducted from the sales in order to ascertain the profits, they would necessarily fall *pro rata* upon the parties.

The intention of the writers of the letter of instructions is, we think, clearly apparent. It was not, as insisted for the defendants, " a new, distinct, and substantive proposition, perfect within itself," and which, when accepted by Niles, swallowed up his proposition. It was not so intended by the parties who wrote it. It could not have been so understood by Niles. When they said to him, " We will meet your proposition," could he suppose they meant, " We will have naught to do with it?" If such was their meaning, they obviously intended to commit a fraud upon him. But it was not. Had it been their intention altogether to depart from his proposition, they would have said to Samuel Stebbins: " We will not 'meet' the proposition of Mr. Niles, nor 'close' it with him; but you may make a contract with him, upon such and such terms."

We consider it, therefore, too clear to admit of doubt or question, that, by the very terms of the contract between the par-

ties, the defendants, while they were bound to pay Niles $1,000 per section for the lands, were also bound to bear two thirds of the expenses attending locations and sales.

The items of the first expense account of Niles will be found in the record. The whole account is made up to August, 1837, and amounts to upwards of $13,000. It seems that Niles was also engaged in two other speculations; and that he divided the whole expense account ratably among the three speculations, — the proportion of the association speculation being $8,829.30. The counsel for the defendants seem ready to exclaim, " Here is a great mystery!" They complain that we have not proved the several items of the expense account, nor shown how we arrived at the sum of $8,829.30. We submit, however, that it was unnecessary in this case. That item having been decreed by the vice-chancellor to be a stated account, we were thereby relieved from the necessity of making such proof before the master, or at the hearing. The *onus* was cast upon the defendants of proving the incorrectness of the items composing the accounts, and they made no attempt to do so.

The account of those items was furnished by Niles to Samuel Stebbins, in the summer of 1838. We cannot prove this fact directly, but we may reasonably infer it from circumstances. We put the question to Samuel Stebbins, and ask him whether it was not so furnished to him, and what has become of the original? He answers, " He knows not," thereby evading the first branch of the question. We shall have much to say in regard to this witness before we are done, but, for the present, it is sufficient to observe that he leans strongly against Niles; that his testimony in our favor is extracted with difficulty; and that while his memory is fresh and clear in regard to every circumstance that can operate against us, he can recollect nothing that is in our favor. It is to be presumed, therefore, that, if he had answered our question, he would have answered affirmatively. The invoice, showing the cost and expenses of the land to be $58,829.30, was handed to Stebbins. It was attached by Stebbins to the power of attorney, September 14, 1838. At the foot of that " invoice," Niles says, "*Pro rata* proportion of expenses, as per expense account herewith handed, $8,829.30."

It is to be presumed that the expense account accompanied the invoice. Further, the first account current of Niles was rendered in the summer of 1838, and the first item in that account embraced the expenses. It was in the hands of the association at the meeting of the 10th of September, 1838, and it cannot be supposed that they would have held an account, containing such a charge, not specified, without objection.

We think it evident enough, that the items of the expense account were furnished to Samuel Stebbins at the same time with the invoice and first account current. If this was not so, how were the defendants enabled to specify their objections to the items of the expense account, as is done in their answer?

The defendants admit in their answer that Niles rendered his account current, showing a balance in his favor of $15,579.30, in August, 1838. The same fact is proved by Stebbins. Niles says this account was received and held without objection until 1844. The defendants say it was objected to. This is an affirmative fact, the proof of which devolves upon the defendants. Samuel Stebbins is their only witness. He says, " I recollect the claim of $8,829.30. Other accounts were received by me, but when precisely I cannot say. I do not remember making specific objections. I think I told Mr. Niles I thought it was extraordinary. I remember no other objections." Again he says, " Mr. Niles, at the meeting in the fall of 1838, of the association, presented a claim which I find was for $8,829.30. Surprise was expressed at the charge, and he withdrew the account." This witness testifies May 11, 1847, nearly nine years after the date of the occurrence of which he speaks. His memory is most wonderful. On the 15th of December, 1842, he wrote to Niles as follows: " I have no distinct recollection of any specific understanding, that the expenses of the association were to be paid before the parties were to be reimbursed. We may have talked this matter over, and it may have been agitated at the meeting held at the National Hotel, (September 10, 1838,) but I cannot say positively that such is the fact." How is it that the man who, in 1842, does not recollect whether the expenses were to be paid before or after the reimbursement of the capital, nor whether that question was even " agitated "

at the meeting of September 10, 1838, can so clearly remember, five years afterwards, that it was settled at that meeting that the expenses were not to be paid at all? Is his testimony, upon this point, to be credited? And if not, what becomes of the alleged objections to the account? In fact, there were no objections, except as to the item of $44. Look at the minutes of the meeting at the National Hotel. All that Niles had then done, " was considered satisfactory by all the gentlemen present." They say that he then presented his expense account, and afterwards withdrew it. That must be untrue. It had been previously rendered, and there was no sense in presenting it then. Besides, if it was withdrawn, as they say, why did he not also withdraw his account current, wherein the same charge was made? Was the meeting "satisfied" with that, while they could not look upon the expense account with the least degree of allowance? Is it not strange, too, that they *should* be so well "satisfied" with an agent, who, according to their present statements, was then, before their very eyes, trumping up false accounts against them? Is it not still more unaccountable, that, with such a specimen of his integrity before them, they should then have ordered a power of attorney to be executed, to enable him to sell all their lands? In view of all the circumstances of the case, we deem it unnecessary to say more in support of our position, that the first account was not objected to.

In the summer of 1841, Niles again visited New York. He remained there for some time, and was in almost daily intercourse with Samuel Stebbins, Russell Stebbins, and John Brower, — three members of the association. Samuel was the regular and authorized agent of the association, — the medium of communication between Niles and the association. He had been, by letter and otherwise, fully informed by Niles of every thing that had occurred, relative to the affairs of the association. The time when Niles was to leave was known to Samuel, who accompanied Niles to the boat on which he left. No sooner had he gone, than the members of the association got up a little "indignation meeting," passed some fierce resolutions of censure, and directed Mr. Storrow to send them to

Niles. This was done. In August, 1842, Niles sent to Storrow another account current, (with other accounts,) showing a balance in his favor of $12,312.29. He also wrote a letter to Storrow, who acknowledged the receipt of the accounts, Nov. 1, 1842. No objection was made to the accounts from any quarter. Storrow says that "the members of the association were dissatisfied with the accounts." It seems, however, that they kept their dissatisfaction to themselves, for they say that "the reason why no objection was made to the accounts was, the wish that Niles might again visit New York, and the apprehension that if objections were made to said accounts, he might be the less disposed to make such visit." The defendants' counsel say that these accounts were objected to. Their clients swear that such was not the fact. The defendants say, however, that Daniel Low, in 1843, when he visited Niles at Pontotoc, "distinctly informed Niles that there were items in his account wholly inadmissible, and, particularly, that the item of $8,829.30, would not be allowed by the association." Old Storrow is said to sustain this statement. In answer to our fourteenth question, he says, "Low disapproved of the charges, (in the accounts of Niles,) and said he had so stated to Niles." He is the secretary of the association, and we ask the court to read his deposition, and see whether it is not evident that he considers it a part of his official duty to do what little swearing he can, for the benefit of his employers. Walter Jagger says: "In February, 1844, I had a conversation with John Brower, (one of the defendants,) who informed me that Daniel Low had returned from Pontotoc, and reported that Mr. Niles had conducted, and was conducting matters in Mississippi to his entire satisfaction." The defendants say, in their answer to the amended bill, that "Low was dissatisfied with the manner in which Niles kept his accounts." On the 2d of March, 1844, the same Daniel Low writes to Niles as follows: "The time is fast approaching when you promised to be here. I have given our friends the most positive assurances that you would be here by the first of May, under the penalty of allowing us the whole of your account. I hope you will not place yourself in a position to forfeit the same." On the 4th of April, 1844,

Low wrote to R. E. Orne, as follows: "Say to Mr. Niles, that in case he is not here by 1st May, he will forfeit about $20,000 for non-appearance." Seeing, from these letters, how very anxious Low was to get Niles to New York; remembering, too, that they say they would not make any objections to his accounts in 1842, lest the objections should prevent his visiting New York, we ask whether it is probable that Low, in 1843, told Niles that his accounts would not be allowed? The obvious inference from his letters to Niles and Orne is, that he had sanctioned the accounts of Niles in 1843, and promised to pay them if Niles would go to New York; and that Niles had promised to go, or forfeit his account. If Low told Niles that nothing was due him, or that his account would be disallowed, it is most singular that he should have attempted to bind Niles to go to New York, under the penalty of forfeiting that which Low declared to him he was not entitled to.

We take it, then, to be unquestionably true, that Niles rendered his accounts in 1838 and in 1842, and that those accounts were not objected to by the defendants until 1844. What is the legal consequence resulting from these facts? We contend that the accounts, thus rendered, thereby became stated accounts, and are binding upon the defendants as such.

The counsel for the defendants quote from 2 How. 786: "An account stated is an agreement between the parties, that all the articles are true." We admit that this is one definition of a stated account; but it is not the only one.

"It is not necessary, in order to the validity of a stated account, that it should be signed by the parties. It will be sufficient if an account has been delivered and acquiesced in for a considerable length of time." 2 Daniel, Ch. Prac. (Perkins's edit.) 762; 1 Story, Eq. Jurisp. § 526, 527; 2 Atk. 251–253; Johns. Ch. R. 575; 2 Ves. 239.

This rule is not confined to cases between merchant and merchant. 12 Leigh, 173; 2 Tucker, Com. 129.

The defendants' counsel seek to evade the operation of this rule, by saying, that it does not apply to accounts between principal and agent. There is no loop-hole for escape here. To avail themselves of the exception, they must show that

Niles has concealed something from the defendants which they had a right to know, and which, if known, would probably have induced them to object to his accounts when they were rendered. 2 Daniel, Ch. Prac. 765, and cases cited. They also resort to the items of the original expense account, and contend that some of them are not properly chargeable to them. But, if we have correctly construed the contract, those charges are proper. Niles charges nothing for his services. He charges only the expenses attending the transaction of the business of the association, and this he had a right to do. If the expenses were high, it was not the fault of Niles, but of the times. Furthermore, this is not the time to make such objections. They should have been made in 1838, when the account was rendered. We say, then, that Niles's accounts of 1838 and 1842, were stated accounts in 1844, and we apprehend that the authorities cited against us on the other side will be found, upon examination, to apply only to settled accounts. The distinction between stated and settled accounts, is stated in 1 Story, Eq. §§ 527, 528; and 1 Ball & Beat. 428; and 1 Eng. Cond. Ch. R. 179, are cited in a note as instances of a settled account, and not as stated accounts.

The accounts of Niles being thus shown to have been stated accounts, we think the court below erred in giving the defendants leave to surcharge and falsify them. This assignment of error is based upon the pleadings. A party cannot, in an answer, set up inconsistent and contradictory defences. This was not allowed at common law, until a statute conferred the right. Our earlier fathers abhorred the very appearance of evil, and would not tolerate such a system, even while it involved no moral guilt. That a defendant in chancery, who must disclose his defence on oath, may set up inconsistent defences, cannot be seriously urged. The defendants here would not have been permitted to say : 1st, that the accounts of Niles were objected to in a reasonable time, and, therefore, were not stated accounts; and, 2d, that the accounts were not objected to, but that there were errors — specifying them — and ask leave to surcharge and falsify. This would involve perjury upon the face of the answer; and, if it cannot be done in the

answer, we insist that it cannot be done at all. The object of all pleading is to ascertain the matter in dispute between the parties, who are concluded by their pleadings in chancery as fully as at law. The defendants say, in their answer, that the accounts of Niles were objected to. They were bound to prove this issue. Gresley, Eq. Evid. 289; 2 Tucker, Com. 487. They failed to do this, and they now seek to present a new issue *ore tenus*; to admit what they have denied in their answer, and ask leave to surcharge and falsify. We insist that they cannot be permitted thus to require us to investigate a new issue.

It is said that the item of $8,829.30, even if it were the true amount properly expended by Niles, and although the defendants should be held responsible for two thirds thereof, ought not to have been charged in full to the association, but that only two thirds of the amount should have been thus charged. There is nothing in this objection to the account, if our view of the contract be correct. The whole amount of the expenses had been advanced by Niles, and he was entitled to be reimbursed before any portion of the capital was refunded. He would thus bear his *pro rata* proportion of the expenses, because it would diminish, *pro tanto*, his share of the profits. The account could not properly have been made out otherwise, and would not have been by any accomplished accountant. It exhibits the real character of the transaction, and requires no explanation.

The defendants, in their answer to the original bill, set up an agreement entered into by Niles on the 15th of October, 1844, as a bar to all the relief prayed for in the bill. We insist that, in equity, that agreement is void, as having been obtained by fraud, circumvention, and duress; that Niles was enticed to New York by the defendants for the purpose of defrauding him, and that this agreement was the consummation of their iniquitous scheme.

The defendants admit, that they made no objections to the accounts rendered by Niles in 1842, lest Niles might thereby be deterred from visiting New York. Why did they want him there? In their answer to the amended bill, they evidently

endeavor " to give color to the idea," that Niles was not even solicited by Low, in 1843, to visit New York. They even got old Storrow to swear that " no request had been made, for about two years, for Niles to come on." Low, in 1843, urged Niles to visit New York, and obtained his promise to do so. Why this anxiety to get Niles in New York, while all the books, papers, and vouchers relating to the business were in Pontotoc? Jaggar says that Brower informed him, after Low's return, that Niles was prepared to settle by a division of the lands, notes, &c., and would shortly be in New York for that purpose. This affords an explanation of the means employed by Low to induce Niles to visit New York. He did not say to him : " We will disallow your account, and you must come to New York, in order that each member of the association may have an opportunity of saying the same thing to you." Niles could not have supposed, from such " a talk" as this, that he could reap any advantage from a trip to New York. Low did not " come at him" in that style. He said : " Come to New York, and your account shall be paid. The sale of lands is a slow business here. Come, and we will divide the lands, notes, &c.; and there will be no difficulty in closing the whole business. You will thus obtain your share at once. We owe you a large amount — nearly $20,000. Will you agree, now, that if you don't come, you will forfeit your account against us?" Niles answers : " I'll come." Low goes back to New York, and in March, 1844, he writes to Niles : " I hope you will not, by failing to be here on the 1st of May, place yourself in a position to forfeit your account." How anxious Low is, lest the interests of Niles may suffer! In a month afterwards, he writes to Orne : " Say to Niles, that if he is not here by 1st May, he will forfeit about $20,000 for non-appearance." This message was communicated by Orne to Niles. If the language of these letters of Low to Niles and Orne, does not necessarily imply the fact that he had recognized and approved the account of Niles, and promised that it should be paid, if Niles would only come to New York, we cannot suppose that it means any thing.

Niles visited New York in the summer of 1844. We sup-

27 *

pose he arrived there after the 1st of May, for we find that on the 23d of August, for the first time, he was presented with specific objections to items in his accounts, amounting to $21,533.42. His account, doubtless, was regarded by the defendants as being "forfeited for non-appearance." Niles and the defendants met on the 28th of August, but they could not agree upon the terms of a division and settlement. The defendants wanted "the lion's share." Niles wanted what was his due. A committee was appointed by the defendants to confer with Niles. Their conferences resulted in nothing. He could not be persuaded to give up all to them. They then turn upon him and ask him for his vouchers, relating to his expense account. Of course, they were all at Pontotoc. They insist that Niles was bound to have had his vouchers in New York; and authorities are gravely cited to show that it is the duty of an agent to produce his vouchers at the request of his principal. We have but this to say in reply: If Niles had been a fool, he might have thought of taking his vouchers to New York. Not being a fool, such an idea never occurred to him. His accounts had been rendered and acquiesced in for many years. He had been solicited to visit New York, not to show his vouchers, but for the purpose of dividing the lands, &c., and obtaining payment of his account. Low, doubtless, saw the vouchers in 1843, and told Niles they were "all right." Why, then, should Niles have taken his vouchers to New York, where he had no reason to suppose their production would be required?

They further say that the various propositions submitted by them to Niles, "were discussed without reference to the fact that he was under arrest."

In examining the testimony here, it is to be recollected that Niles cannot reasonably be expected to make very full proof of all the circumstances that occurred after his arrest and up to the time when he was discharged.

Niles was arrested on the 15th of October, at about 11, A. M. He met Russell Stebbins and George B. Butler at the house of William Stebbins, at about 5, P. M. The agreement was signed before 9 o'clock that night. It was signed while

Stebbins et al. *v.* Niles.

he was under arrest. The defendants say in their answer, that the agreement was executed after he was discharged from arrest, but the proof shows that not true. Various propositions were made and discussed. These discussions necessarily occupied some time. The agreement was not drawn up in a minute. The discussions upon it were of a very hasty character. No time was allowed him for reflection. He asked to have the matter postponed until the next morning. This request was brutally denied. He did not know for what he was arrested, for he had not seen the bill that was filed against him. He was " a stranger in a strange land," and in the hands of his enemies. The agreement was " poked at him " with the demand, " Now, sir, sign this." He did sign it; and, under the circumstances, it would not have been strange if he was willing to sign any thing.

But the counsel for the defendants now say that they were justified in this proceeding; that Niles had refused to deliver up their securities. We ask them to point out the allegation in their answer that the securities were demanded of Niles, or the proof in the cause that the demand was refused.

They say, further, that no injustice was done to Niles; that he obtained, by the agreement, more than was due him. They owed him about $15,000. They held him to bail in the sum of $50,000. He was not able to give it. He was thus left completely at their mercy, and, therefore, he signed the agreement.

An agreement thus obtained, will be set aside by a court of chancery. 1 Atkyns, 409; 6 Mass. 506; 16 Pet. 269. Even in the absence of these authorities, we should insist that the agreement could not be permitted to stand, upon the broad and general doctrine that instruments obtained by fraud, circumvention, and oppression, are not enforced by courts of equity. 1 Story's Eq. Jur. § 251–261.

But it is said that Niles, by his subsequent acts, ratified the agreement; and, therefore, that he is now concluded by it. Business of Niles required him to remain in New York for some time after his arrest. During this whole period, so fearful was he of being again arrested by the defendants, that " he

only appeared in public once or twice." He had once been ar-
rested without cause; and if he had openly repudiated the
agreement, he could only expect to be again arrested. He was
effectually under arrest. It was but natural, therefore, that he
should have been present on the 24th of October, when the
seven sections that he was to receive were "gambled for."
The same influence induced him to sign the advertisement, in-
tended for publication in Mississippi. These are not such acts
of acquiescence as will bind Niles. When we look at them
"in the light of surrounding circumstances," we see that they
were not voluntary acts, any more than the signing of the
agreement was a voluntary act. They are, therefore, entitled
to no weight.

The transaction of the 19th of November explains itself.
Niles had represented that he had delivered up all the securities
in his hands, at the date of the agreement. He afterwards as-
certained that, by mistake, he had omitted to deliver up an
attorney's receipt for three notes. He is a gentleman; and, as
such, he felt bound to make his representation good. There-
fore it was that he handed over that receipt, and had the fact
indorsed upon the agreement.

When the witnesses say that Niles "voluntarily" executed
that agreement, they can only be understood to mean that no
actual force was employed to compel him to sign it, because,
in fact, he was not a free agent when he signed it.

Further, we say that the writ of *ne exeat*, upon which Niles
was arrested, was illegally issued. The fiat required the de-
fendants to give a bond before the writ issued. The transcript
from New York, filed by them, discloses the fact that they gave
no bond. By some sort of juggling, they obtained process to
which they were not entitled. The transcript of the bill filed
in New York is incorporated in the record first filed here. We
contend that the defendants were bound to prove their allega-
tion — that Niles was legally arrested, upon process legally
issued. Not having proved that fact, and having shown, by
the record from New York, that the process issued without au-
thority of law, they cannot here avail themselves of an agree-
ment obtained from Niles while, and because, he was under
arrest upon that process.

The defendants say that they have ever been, and now are, ready and willing to execute the agreement on their part. Look at Orne's deposition, and read it in connection with Storrow's letter, directing the sale of the seven sections set apart to Niles under the agreement. This proves that they were not willing, themselves, to act with good faith towards Niles in reference to the agreement, but that they had formed the design of "gouging" him out of every thing. He represented, in the agreement, that the thirty-nine sections remaining unsold were "free from incumbrances laid or suffered by him." They attempt to construe this into an affirmative allegation that the Indian titles had been perfected.

This court is gravely requested by the counsel for the defendants to investigate an assumed issue of fraud in this cause. The pleadings present but one such issue, and that is most effectually disposed of. The defendants charge, in their cross-bill, that Niles attempted a fraud upon them by representing that he was to obtain choice lands, whereas seven of the fifty sections were refuse lands, not worth more than thirty-five cents per acre. Niles answers that those are not refuse, but choice lands, and that they will average five dollars per acre in value. The answer of Niles being thus responsive to the allegations of the defendants, and meeting them with a direct denial, it is evidence for Niles, unless overturned by positive proof. There is no proof in the record militating against the answer. No issue upon this point is presented by the pleadings, nor, if it were, could the defendants sustain it. Niles had made his contracts with the Indians for the purchase of their reservations, at an early period. Those contracts were in the nature of bonds for title, and it was believed, at that time, that they were obligatory upon the Indians. General Jackson, however, "wiped out" the whole of them in the spring of 1836. This is what Samuel Stebbins refers to in his letter to Niles of the 23d of March, 1836. Niles could not raise the money to meet his engagements with the Indians. Hence his proposition to Samuel Stebbins. He believed, in common with almost every man, who, up to 1836, was engaged in speculating in Chickasaw lands, that a fortune might easily be realized from the

reservations. To us, who can now coolly look back upon the past, it may seem as though men were then infatuated; but not so thought the men of that day. They were deceived, it is true; but honestly so. Who then dreamed that this state of things was to be of such brief duration, and that the spring of 1837 was to usher in a scene of universal distress? And yet, while all this is matter of history, men can be found to take up the letter of Niles, containing his original proposition, and contend, with as much apparent earnestness as though they regarded it is a part of "the faith once delivered to the saints," that the contents of that letter evince a settled and deliberate design on the part of Niles to delude and defraud the defendants! The defendants were not misled by that letter. The Chickasaw treaty was concluded at Washington city on the 24th of May, 1834. It was not only a public law, but, under the constitution, so far as its provisions extended, it was "the supreme law of the land;" and every man, whose interests were to be affected by it, was bound to take notice of it. The defendants had not only this constructive notice of the treaty, but they were actually aware of its provisions. The defendants well knew what instructions had been issued by the war department, relative to the mode in which the provisions of the treaty should be executed. It was one feature of those instructions, that the location of no reservation should be regarded as final until it had been approved by the President. He knew that no location had been made, up to that time, and that the country had not then been surveyed. It is said that Niles represented some thirty sections of the land as having been located. We have already seen that the defendants knew no locations had then been made. When we refer to the letter of Niles, written after his note of the 22d of May, we find that he meant, in his original proposition, not that the thirty sections had actually been "located," but that he had made purchases from Indians who were entitled, under the treaty, to "local" reservations, being lands upon which the Indians resided, and which, therefore, if fit for cultivation, they were bound to take as their reservations, under the provisions of the treaty; whereas, those Indians who had not a fixed residence,

were entitled to have their "floating claims," — as they were termed, — located upon any vacant land in the nation, "so as not to interfere with the settlement rights of others."

The contract was concluded on the 22d of May, 1835, when Niles sent his note of acceptance to Samuel Stebbins. To say that a letter, written by Niles after the contract was concluded, had any influence in inducing the defendants to enter into the contract, is to pursue a course of argument, the force of which we cannot appreciate, and which, if we were engaged in it, would seem to us to be a very silly occupation.

It next becomes us to inquire, what was the character of the relation sustained by Niles towards the defendants, under the terms of his contract with them? Was he a partner, or an agent? We say, that he was a mere agent. Doubtless, had his original proposition been acceded to by the defendants, he would have been a partner; but that proposition was essentially modified by the terms of the letter of instructions. In the agreement between themselves, defendants provide that Samuel Stebbins is to take the titles to the lands "in his own name, in trust for the parties to that instrument;" meaning themselves alone. They provided, in the letter of instructions, that Niles should be governed by the instructions of Samuel Stebbins, in all matters relating to the business of the company. They *stepped* forward in the place of Niles, and took his Indian contracts off his hands. They required him to take the titles to a trustee selected by themselves; thus appropriating the property of the lands to themselves. They stipulated that Niles should be governed by their directions; thereby making him their servant or agent. The provision, that he should have one third of the profits of the speculation, was intended merely to fix the amount of his compensation, and incite him to diligence. These facts, we insist, establish our position, that Niles was a mere agent, and not a partner with the defendants. One is not a partner, if he merely receive out of the profits a compensation for his trouble, in the character of an agent or servant of the concern. Collyer on Part. §§ 25, 27, 31, 39, p. 31, note 1, pp. 34–39, §§ 170–173; 6 Metcalf, 90; 3 Kent, (5th ed.) 33, 34; Story on Part. § 36; 18 Wend. 185; 20 Ib. 70.

To make one a partner, he must not only share in the profits, but must share in them as a principal trader. Collyer on Part. 21–38, and note 39; 1 Denio, 337; 12 Conn. R. 77, 78; Story on Part. §§ 49, 55, p. 69, and note 70, § 48.

Even as to third persons, there must be a share in the loss, as well as in the profits, to constitute a partnership. Story on Part. §§ 49, 55, and p. 71, note. If the whole capital stock embarked in an adventure belongs to, and is the property of one of the parties; yet, if there is a community of profit, or of profit and loss, in the enterprise or adventure, between all the parties, they will be partners in the profit, or in the profit and loss, between themselves, and as to third persons, although not partners in the capital stock. Story on Part. p. 41, § 27, and note. Niles, therefore, if there had been a loss in this speculation, would not have been bound to bear any portion thereof, because there was no contract to that effect; for a mere participation in the profits will not make the parties partners *inter sese*, whatever it may do as to third persons, unless they so intended it. Collyer on Part. § 79; 4 East, 144; 10 Johns. R. 226.

There must be a joint ownership of the partnership property, which was not the case in this instance, to constitute a partnership *inter sese*. 1 Freem. 369; 4 Paige, 148; Story, Partn. 1–3, 20–22; Collyer on Partn. § 16; 5 Leigh, 585; 16 Johns. R. 34.

Even if Niles is to be regarded as a partner of the defendants, we say: In partnerships, where work is contributed on one side, and money on the other, the partner from whom the money comes may contribute either the use of the money only, or the property of it. If he contributes only the use of it, and still keeps his property in the principal, so that the joint stock is to be considered as made up of the labor of one partner and the use of the other's money, it is plain that, supposing the principal to be safe, it belongs to him who has contributed it; and that, supposing it to be lost, he alone is to bear such loss. The party who contributes work is not bound to bear any part of the loss. Story on Partn. 40, 41, note; Ib. 43, 44.

Niles, being the agent of the defendants, is entitled to the immediate repayment of all expenses and advances disbursed

and, made by him in .the course of his agency, on account, or for the benefit, of the defendants. Story on Agency, § 335; Story on Bailm. §§ 196, 197, 357, 358. And it matters not, as to this point, whether the speculation results in a loss or a profit. If all the lands had been sold, and produced less than $50,000 and interest, Niles would still have been entitled to the repayment in full; and if entitled to it at all, he is entitled to it at once, in the absence of any agreement that he was to await the final disposition of the lands. He is also entitled to interest upon his advances and disbursements. Story on Agency, § 338; 7 Wend. 315; 1 H. Blackf. 303.

We have seen that Niles was to have had, under the con- tract between himself and the defendants, one third of the profits of the speculation, as a compensation for his services. He rendered services from 1836 to 1844, when, by the wrongful act of the defendants, he was deprived of the power of render- ing any further service in the business. We say, that at the moment when his authority was revoked, he had a right to claim a settlement, and to be remunerated to the extent of the service then performed; upon the ground, that an agent is entitled to compensation when entire performance is prevented by the act of his principal. Story on Agency, § 329; 1 Carr. & Payne, 384; 7 Bingh. 99; 10 Barn. & Cress. 438. Especially does this rule prevail in cases where the agency revoked is coupled with an interest in the profits, and the authority has been partly executed. Story on Agency, §§ 465, 466, 483, and note 4. But it is objected here, that, to do this, would be to depart from the terms of the original agreement, and that we have not prayed for this relief. We answer; the defendants having themselves violated that agreement by their action on the 15th of October, 1844, cannot now set it up for their own protection. Let them settle with us as on the 15th of October, pay us our account as finally decreed, and, also, one third of the profits realized upon the sale of the eleven sections — $10,128.22 — with interest from October 15. Then, let the defendants be required to account to us for the remaining lands, either by charging them with the value of those lands in 1844, or by directing a sale of the lands, and dividing the

proceeds as contemplated by the original agreement. This would be to execute the agreement according to the equities that have accrued to Niles under it, since it was originally made. It is true that we have not prayed for this specific relief, but we deem it unnecessary to cite authorities in support of the general proposition — that upon the prayer for "other, further, or general relief," if a proper case be made out, by the pleadings and proofs, for relief different from that specifically prayed for, a court of equity may grant the appropriate relief. If the defendants had permitted Niles to go on and dispose of all the lands, they might then have insisted that he should receive no part of the profits until they were fully reimbursed. But when, by wrong and violence, they set the agreement aside, and took every thing into their own hands, they were bound to pay him what was then his due, and could no longer require him to wait for it until all the lands should be sold. They cannot be permitted thus to "work iniquity," and then to reap the profits of their wrong. The accounts and report of the commissioner below, furnish all the materials necessary for drawing up a decree on this point.

The defendants set up, as a bar to all the relief prayed for by Niles, the plea of the statute of limitations; that his cause of action did not accrue within six years; and to show that they are in earnest, they plead the statute twice. We think that plea can be easily disposed of. 1st. It sufficiently appears from the record that the defendants, with the exception of Samuel Stebbins, who was a citizen of Mobile, (Alabama,) were all residents and citizens of New York at the date of their original contract with Niles in 1835. It appears, also, that they are all non-residents of Mississippi now. It is, therefore, fair to presume that they have continued to reside beyond the limits of Mississippi during the intermediate period. At least, in order to render it necessary for us to amend our bill and set up their non-residence as matter in avoidance, they should have averred, in the plea, that they had been residents of this State at some time since our cause of action accrued. They have not done this. It is said, however, in argument, that they have had lands in this State all the time, against which we

might have proceeded by attachment. Let us suppose that such was the fact. Our statute of limitations carves out no exception in their favor on that ground. It is settled, that the statute does not run in favor of any person until he comes within the limits of the State, (5 How. 258,) and this notion about owning lands here seems to us to be too fanciful for serious argument. But, 2d, we say that the plea cannot be sustained, because Niles had a lien upon the lands, notes, &c., for the repayment of his advances and disbursements; that he could have enforced that lien, while the lands, notes, &c., remained in his hands, even though the defendants had all been citizens of this State, and it might have been impossible for him, in an action of assumpsit, to have recovered against them, in consequence of the statute of limitations. This would have been the ordinary and common case of a party having two remedies for the recovery of the same debt; one barred by the statute, and the other not. In such a case, he is permitted to pursue the remedy that is not barred. 6 S. & M. 651; Angell on Lim. 176; 3 Campb. 418. In the present case, Niles held in his own hands the means of paying himself, up to 1844, when we say those means, upon which he had a lien, were illegally taken out of his possession by the defendants. Can they, under these circumstances, take advantage of their own wrong? If Niles had not felt himself secure, from the fact that his lien protected his rights, he would have sued the defendants before 1844. Feeling thus secured, he did not think it necessary to sue them. In 1844, he was illegally deprived of this security, and because he was thus deprived of it, the defendants now contend, in a court of equity, that he has lost all remedy against them! We admit the general doctrine, that where a party, having a lien upon property, parts with the possession of it, he cannot afterwards enforce his lien. But he must part with the possession voluntarily. If he be deprived of the possession by force or fraud, it would be a singular sort of equity that would hold him to have thereby lost his remedy.

We will next consider the questions arising upon the cross-bill of the defendants, and the answer of Niles thereto.

And first, as to our demurrer. We assign two causes of demurrer. One is, that Samuel Stebbins is not made a party to the cross-bill. The object of the cross-bill is to make Niles responsible to the defendants for the seven sections of land alleged to be without title; and it proceeds upon the ground, that he is responsible to them upon the warranty contained in his deeds for those seven sections. To whom were those deeds executed? To Samuel Stebbins. Upon the face of the deeds, it does not appear that Samuel Stebbins was a trustee for the defendants. The conveyances are made to him in his own right. The defendants are here seeking to avail themselves of a contract made by Niles with a third party, with whom, upon the face of the contract, they appear to have no connection. They should, therefore, have made him a party, either as complainant or defendant. But even though the deeds had been executed to Samuel Stebbins as a trustee for the defendants, he would still have been a necessary party. Edwards on Parties, tit. Trustee and *Cestui que Trust.* It will not do to say that Niles is responsible upon the original agreement, as well as upon the warranty contained in his deeds; for when the deeds were executed, the agreement, in relation to titles, — even supposing it to have contemplated perfect titles, — was merged in the warranties. If the defendants held him liable to them for perfect titles, they did so upon his warranty of title, and not upon the agreement; for his deeds had been accepted by them.

The other cause of demurrer assigned by us is, that if the defendants have any remedy against us in respect of the seven sections alleged to be without title, it is a purely legal remedy, and must be enforced in an action at law, for a breach of the warranty contained in his deeds. Upon this point, we conceive it to be sufficient for us to invoke the application of the familiar principle, that where a party has a clear, adequate, and unembarrassed remedy at law, he will not be allowed, however just his claim, to resort to a court of chancery for relief. It is not even pretended by the defendants, that a suit at law would not afford them all the relief to which they are entitled in relation to the seven sections.

But, aside from the demurrer, we insist in our plea, that, even if Niles was bound, under the original agreement, to furnish perfect titles to Samuel Stebbins, he was released from that obligation, as well as from all liability growing out of his warranties, by the bond of indemnity executed to him and Samuel Stebbins by the defendants on the 14th of September, 1838. It is said that it was not the purpose or intention of the defendants to release Niles by that bond. We think that, clearly, such was their intention, and that such was believed by Niles to have been their intention when he received it. Otherwise, it was wholly useless to him as a bond ·of indemnity, and was a silly affair on both sides. At the meeting of September 10th, 1838, Niles explained to the defendants "the character of the titles" he had obtained for them, "which he exhibited," and which were "considered satisfactory by all the gentlemen present." The defendants here resort to Samuel Stebbins for evidence to explain away the effect of the minutes of that meeting, and he does his best for them, by volunteer answers; but we submit, that the record of a transaction, contemporaneous with its occurrence, is more reliable than the random recollections of a witness whose memory has been shown to be of such a peculiar character. We take it, then, to be undeniable, that all the Indian deeds for the fifty sections — including the deeds for the seven sections under consideration — were exhibited by Niles at the meeting of the 10th of September. Some of those deeds — forty-three of them — had been approved by the president. The other seven had not. The most cursory examination of the deeds would have led to the discovery of this difference between them, even if Niles had not pointed it out. It was, it must have been, known to the defendants, that seven of the deeds were defective for want of the requisite approval. They say that Niles deceived them in regard to the validity of those titles. They were as well acquainted as he was with the provisions of the Chickasaw treaty, and undertook, with a full knowledge of all the facts, to determine the law for themselves. If they erred herein, what court will visit the consequences of their error upon the head of Niles? The last deeds executed by Niles to Samuel Stebbins

28 *

were executed on the 8th of September, 1838. At the meeting held two days afterwards, it was directed that Samuel should execute a power of attorney to Niles, authorizing him to dispose of the lands. Four days subsequently, the bond of indemnity was executed. It will be noticed, that Samuel Stebbins is one of the parties both of the first and second parts to that instrument, that he is both an obligor and an obligee. Why was this? Obviously, because he was to be indemnified by the other members of the association against any liability that he might afterwards incur by executing deeds of warranty to their vendees, and because Niles was to be indemnified against, or released from, the liability that he had incurred by executing warranty deeds to Stebbins; and Stebbins was a necessary "party of the first part" to this contemplated release. We have here a key to the meaning of this language in the bond; they agree "to defend and protect any and all such warranty deeds as now are, or may be issued by the parties of the second part, predicated upon Indian titles." The words "now are," refer to the warranty deeds already executed by Niles to Stebbins. The intention is, that Stebbins and his associates shall release Niles from all liability on account of those deeds. The words "may be," relate to such deeds as Stebbins may execute thereafter to his vendees. Against all liability upon such deeds, his associates intend to indemnify him. The defendants say in the bond, that "they had confidence in the Indian titles acquired through the said Niles." They now ask us to believe that they "had confidence" in regard to matters, about which they knew as little as unborn babes. They further say, that they desired "to save harmless the parties of the second part," of whom Niles was one. What "harm" was threatening Niles, against which it was considered desirable to protect him? He had executed no deeds, except those to Samuel Stebbins. It was not contemplated by the defendants that he should execute any deeds, save only in his character of agent, under the power of attorney executed to him by Samuel Stebbins. How, then, was he to be "saved harmless?" Why had he executed the warranty deeds to Samuel Stebbins? We answer, in the language of the

bond, that he did so "at the request of the parties of the first part," the defendants. This "request" implies an acknowledgment on their part that they had no right, under their contract with him, to require him to execute warranty deeds; and this furnishes a clear and satisfactory explanation of the reason why the bond was executed to Niles. It was because he had, at their request, done that which he was not bound to do.

But, was Niles bound, under the original contract, to furnish perfect titles? We contend that, when he furnished the deeds of Indians whose claims to reservations had been located upon lands in accordance with the provisions of the treaty, deeds bearing the certificate of two of the chiefs named in the fourth article, that the Indian vendor was "competent;" and the further certificate of the agent that the certificate of the chiefs was true, and that a fair consideration had been paid for the land by the vendee; he thereby complied with his contract with the defendants, according to the intention of the parties. That he did thus comply with the contract, is evident enough from the face of the seven Indian deeds, in respect of which a question is now raised by the defendants. *Wray* v. *Ho-yo-pa-nubby*, 10 S. & M. 452.

In order to ascertain the intention of the parties to the contract, it will be necessary to resort to the "light of surrounding circumstances." We must again recur to the treaty. Indian Treaties, 450. We there find how locations of Indian reservations were to be made. The commissioners were to make out a list of the persons entitled to reservations, and certify it to the agent, upon whose certificate of its believed accuracy, the register and receiver were to make the locations. Their action was final and conclusive, because no power of supervision was given by the treaty to any other person. Nevertheless, it is well known that General Jackson "took the responsibility" of requiring all locations to be approved by himself. But, by law, the land located by the register and receiver thereby became the absolute property, in fee, of the reservee. 10 S. & M. 452. The Indian, however, could not dispose of his reservation, except in accordance with the provisions of the fourth article, which required the certificates of two chiefs and the Chickasaw

agent, and the approval of the president. The payment of all the purchase-money to the Indian is a condition precedent, which must be performed before the agent's certificate can be obtained ; and that certificate must be procured before the deed can be submitted to the president for his approval.

He (Niles) had made contracts with the Indians for their reservations, and paid a small sum in each case "to bind the bargain." He had no money himself, and needed the sum of $50,000 to enable him to "pay out" the lands. To obtain that sum was the sole object and purpose of his proposition. He referred to the treaty, in order to show how he expected to obtain titles to the lands he had contracted for. That reference made the treaty a part of his proposition, and bound the defendants to take notice of its provisions. We have seen that, without any reference to it, they were bound to take notice of it. But they had actual notice of it, and were familiar with its provisions. They knew that the country had not then been surveyed ; and that, until it was surveyed, no locations could be made. There was no deception or concealment here. Every thing was as well known to the defendants as to Niles. They knew that it would be necessary for him to pay out the $50,000, if they advanced it to him, before he could procure the approval of the president; and, consequently, before he could obtain perfect titles. With a knowledge of all these facts, they drew up the agreement between themselves, in New York. They say, "Whereas it has been proposed by T. N. Niles to make a purchase of fifty sections of land in the Chickasaw country, at the rate of $1,000 for each section, which said fifty sections have been contracted for by said Niles," &c. It is said that the words, "to make a purchase," mean, to make a sale to the defendant. Niles had not proposed to sell lands to them. They did not dream of buying lands from him. They knew he had no title to the lands, — that he merely contracted for them. They therefore proceed, "the parties whose names are hereto subscribed, have associated for the purpose aforesaid." What purpose ? Certainly, not to purchase from Niles that which they knew he did not own, but to become, themselves, the purchasers and owners of the land, — to take

the contracts of Niles off his hands. That this is so, is proved by the language subsequently employed, where they say that Samuel Stebbins is "to apply the money advanced to the making of said purchase." What purchase? The purchase that Niles had proposed to make from the Indians. They say, further, that Stebbins is "to take the title or warrant to said property in his own name, as trustee for the parties to this instrument."

We are referred, for the definition of the word "warrant," to that great authority, Webster's Dictionary. We admit the definition there given to be correct, and ask whether the defendants could reasonably have expected that Niles would execute "warrants" to them? This use of the word "warrant," in immediate connection with the word "title," elucidates the meaning of both, and shows that they are not to be construed as insisted for the defendants. Niles had spoken of "government titles." This was what the defendants had in their minds when they used the words "title or warrant;" and when they say that "the title or warrant is to be taken to Samuel Stebbins, in trust for all the parties to that instrument," they show that they contemplate becoming the owners of the lands in the first instance, and that the titles are not to come through Niles. He was not even to have any interest in the lands, as an owner, but a mere interest of one third in the profits of the speculation; for he was not one of "the parties to that instrument." Stebbins, it is further provided, "is to sell the lands." Niles is to have no voice in the matter, except as the agent of Stebbins.

But it is said that Niles executed some warranty deeds in 1836, and that this proves our premises to be incorrect. As to forty-three sections, the defendants admit the title to be perfect. Niles might well be willing to execute warranty deeds to those lands; because, in so doing, he incurred no responsibility. Not one of the deeds, to either of the seven sections alleged to be without title, was executed before Sept. 8, 1838. Then it was that the question of warranty first became important to Niles. Those titles were defective, and therefore it was that he required indemnity, and that it was given to him.

From the terms of the original contract itself, taking into consideration the circumstances under which, and the purpose for which, it was entered into; and from the subsequent acts of the parties under the contract, showing the construction placed upon it by themselves, and, consequently, the intention with which they entered into it; we think it clear that Niles was not bound to furnish perfect titles, but merely to give the defendants the benefit of his original contracts with the Indians. There is no pretence that he has not done this, in the most scrupulous good faith. The Indians by whom the seven deeds in question were executed, were legally "located" upon the land respectively conveyed by them; they were all "competent" Indians; and Niles has paid them for their lands.

We submit, then, that we have herein established the following propositions:—

1st. That, by the terms of the original contract between Niles and the defendants, they were bound to pay two thirds of the expenses incurred by him in carrying out his Indian contracts.

2d. That, under the original contract, Niles was not bound to furnish perfect titles to Samuel Stebbins; but merely to secure to the defendants the fruits of his Indian contracts.

3d. That, if Niles was liable to the defendants upon his warranties, he was discharged from that liability by the bond of indemnity; or,

4th. That, if Niles is still liable upon his warranties, that liability cannot be enforced in this proceeding.

5th. That the accounts rendered by Niles to the defendants in 1838 and 1842, are to be regarded as stated accounts.

6th. That the defendants were largely indebted to Niles in 1844.

7th. That they enticed him to New York in 1844, for the purpose of getting him in their power and dictating their own terms to him.

8th. That the writ of *ne exeat* under which Niles was arrested in New York, was illegally issued.

9th. That the agreement of the 15th of October, 1844, was obtained by fraud and unlawful duress, and ought to be set aside.

10th. That Niles was the mere agent, and not a partner, of the defendants.

11th. That the plea of the statute of limitations, set up by the defendants, cannot be sustained.

12th. That Niles is entitled, at once, to the repayment of the balance due him for advances and disbursements, as of the 15th October, 1844.

13th. That he is also entitled, as of the same date, and at once, to one third of the profits upon the eleven sections then sold.

The accounts in the court below were taken with great care, and we believe them to be entirely correct. The exceptions to the accounts, filed by the defendants, seem to us to be directed towards the decree under which the accounts were taken, rather than to the accounts themselves.

*Fulton Anderson,* on the same side, made an oral argument.

Mr. Chief Justice SMITH delivered the opinion of the court.

This bill was filed by Thomas N. Niles, in the vice-chancery court at Holly Springs, against Russell Stebbins and others, the members of an association formed for the purpose of speculating in lands situated in the territory then recently acquired from the Chickasaws.

The objects of the bill were to obtain payment of a claim, alleged to be a stated account arising under a contract between the said association and Niles ; to recover his proportion of the profits of the said speculation ; and to subject to the payment of these demands the unsold lands and the assets of the company.

In 1844, a controversy having arisen between Niles and the defendants, growing out of the said speculation, Niles, who was then on a visit at New York, entered into a compromise, by which all of his claims against the defendants were adjusted. By this compromise it was settled, that Niles should surrender the notes and securities then in his possession, for lands of the association which had been sold, and all his interest in the same, and accept in lieu of all his claim, of whatever character,

to the lands and effects of the association, seven sections of the land which then remained unsold. These seven sections to be designated by lot, and to be conveyed by defendants to Niles on conditions specified, but which, at this stage of our investigation, it is unnecessary to state.

The defendants, in their answer, set up this compromise, and rely upon it in bar of the relief prayed for by Niles in his bill. On the other hand, it is contended by Niles, that the circumstances under which the compromise was entered into, render it entirely inoperative and void. A material question hence arises.

And as the construction to be put upon the contract between Niles and the defendants, with reference to his claim to be reimbursed from the proceeds of the sales of the land, the expenses incurred by him in making the locations and surveys, may materially influence our decision of that question. It is proper, therefore, and most in order, that we should direct our attention in the first place to that subject.

No formal contract was drawn out and executed. To ascertain what its stipulations are, recourse is necessary to the correspondence of the parties, in which propositions were mutually made, and modifications proposed and accepted.

The first letter in this correspondence bears date at Mobile, January 23, 1835, and was addressed by Niles to Samuel Stebbins, who afterwards became a member of the association. Niles in this letter says : " Referring to the conversation of last evening, I would remark that I hold fifty sections, or thirty-two thousand acres, in the recently acquired country of the Chickasaws. My investments are made at $1,000 the section, (six hundred and forty acres). I shall be compelled to make the balance of my payments within four months, and being under the necessity of raising the money for the balance unpaid, (I) would be willing to dispose of such proportion as would enable me to meet my engagements at $5 the acre; but would, by all means, prefer giving an interest of one third of the whole speculation to any party who would advance the cost of the lands, as I am convinced it would be more to my interest than to part with an acre at the price named ; the expenses attend-

ing locations, sales to be borne *pro rata*; my own services gratis. I value none of the lands at less than $10 the acre, and much of it at a still greater price, at which I believe it may be closed in less than eighteen months. This done, I should wish to hold the balance for a still better price. The security to the party would be the money advanced, placed in your hands, and to be paid on the government titles at the rate of $1,000 as handed over. I have thrown these remarks hastily together at your suggestion."

This letter was sent by Samuel Stebbins, who afterwards became the agent in the negotiation of the contract, and also in its execution, to defendants at New York. They replied, under date of the first of April following. In this reply, which was addressed to Stebbins, they say: "Inclosed you will find an agreement entered into by the same individuals who subscribe this letter of instructions, by which you will perceive that the fifty thousand dollars, necessary to meet Mr. Niles's proposition for fifty sections of land, is made up; and you can, therefore, close the matter with Mr. Niles on the following terms: —

1. "Mr. Niles to attend to the location and sale of the said fifty sections of land, and take the warrants or titles in your own name, in trust for the parties concerned; and you are to pay to said Niles $1,000 for each title or warrant for six hundred and forty acres, so received by you, to the extent of fifty sections and no more.

2. "Niles is to attend to the business of selling said lands in behalf of all parties interested, under your authority and instructions; and all moneys received on account of sales made to be received by you at the time of conveyance, and to be applied to the repayment of the $50,000 hereby advanced with interest on same, until the whole be refunded; and all the proceeds which may arise from the sale of said lands, over and above the said $50,000 and interest thereon, to be divided, say one third to said Niles, and two thirds to the parties to this agreement, *pro rata*, according to the amounts advanced by each respectively.

3. "If you close the above arrangement with said Niles, you are hereby authorized to draw *pro rata* on each of the parties

to this letter of instructions, and the agreement herewith, at not less than thirty days' sight, as fast as the money is wanted, until the whole fifty thousand dollars is received by you for the fulfilment of your contract with Niles.

4. " You will understand that it is the wish and intention of the parties to this contract, to sell so much of the land as will command a sum sufficient to repay the $50,000 advanced, with interest on the same, whenever, and as soon, as it can be done, at a price not less than $5 per acre. When the capital is thus secured and reimbursed, we will hold the remaining land at a higher rate, say $10 or $15 per acre, according to their respective value, and what may then be deemed most for the interest of all by a majority of those concerned."

Within a short time after its reception, this letter, with the exception of the third article, was communicated to Niles by Samuel Stebbins. The agreement between the parties in New York contains the following clauses explanatory of the objects of the association, to wit: " Whereas, it has been proposed by Thomas N. Niles to make a purchase of fifty sections of land in the Chickasaw country, at the rate of $1,000 for each section, containing six hundred and forty acres each ; which fifty sections have been contracted for by said Niles." " The parties whose names are hereto subscribed have associated for the purpose aforesaid," — " and do hereby constitute the said Samuel Stebbins, Jr., agent," — " and authorize him to apply the money to be advanced to the making of said purchase, and to take the title or warrant to said property as trustee for all the parties."

Niles made no reply to the proposition contained in the letter of instructions, until the 22d of May, when he was urged to give a positive answer. In his letter of that date, he says : " In reply to your note of present instant, this moment received, I would remark that necessity, growing out of circumstances with which you are familiar, compels me to accede to the proposition of Mr. Mead and associates, rather than forego the speculation, with a full confidence in the liberality of the parties when they shall have become convinced of the magnitude of the operation. If Mr. Stebbins will be pleased to furnish

Stebbins et al. *v.* Niles.

me with copies of correspondence, so far as consistent with the interests of those he represents, I will reply fully, that all doubt in relation to the future may be removed."

In a subsequent communication, addressed to Samuel Stebbins, Niles says: "Referring to and confirming my note of Friday last on the subject of Chickasaw lands, I would remark, that the terms acceded to by me are strictly in accordance with instructions received by you, as far as I had an opportunity of judging from your extracts as furnished;" "the probable necessity of prompt action compels me to make the sacrifice."

These extracts constitute the material portions of the correspondence; and from them the terms of the contract must be ascertained. But as to what parts of this correspondence constitute the contract, and consequently as to its terms, the parties are at issue. On the side of the defendants, it is insisted, that the contract consists of the letter of instructions addressed by defendants to Samuel Stebbins, and Niles's letter of acceptance. This position excludes, as forming no part of it, Niles's letter of the 23d January, containing the original proposition.

Insuperable objections oppose this view of the subject. Disconnected with the other parts of the correspondence, it is impossible, out of the letter of instructions and the note of acceptance, to construct a valid contract. Its terms would contain no description of the subject-matter. It would refer to no locality, and would apply as well to land in Florida or Texas as to Indian reservations under the Chickasaw treaty. Such a contract would be void for uncertainty. We are compelled hence to look beyond these documents, and necessarily and naturally refer back to Niles's letter of the 23d of January. In that document and the letter of instructions, beyond all doubt, is to be found the actual contract.

The letter of instructions having been unqualifiedly accepted, whatever it stipulates for must stand; consequently, nothing remains in force of the original proposition, which is inconsistent with or repugnant to its terms.

In reference to the question which we are considering, Niles

says, " the expenses attendant upon the locations and surveys to be borne *pro rata.*"

Was this offer declined by the defendants ? In other words, do the terms of the letter of instructions, by implication or otherwise, exclude the stipulation by which Niles would be entitled to reimbursement *pro rata,* of his expenses incurred in making the locations and surveys ?

Not one word is said in the letter of instructions about the expenses. But that this offer was declined is manifest, as it is contended, from the following considerations. 1st. Because, the defendants say, " Mr. Niles (is) to attend to the location and survey of the said fifty sections of land, and take the titles or warrants in your own name in trust for 'the parties concerned; and you are to pay said Niles $1,000 for each title or warrant for six hundred and forty acres, so received by you, to the extent of fifty sections, and no more ; " but do not say that any sum beyond the thousand dollars per section is to be paid to Niles for any purpose, or under any circumstances whatever. 2d. Because, they say, that " all moneys received on account of sales made, to be received by you at the time of conveyance, and to be applied to the repayment of the $50,000 hereby advanced, with interest on the same, until the whole be refunded ; and all the proceeds which may arise from the said lands, over and above the said. $50,000 and interest thereon, to be divided — say one third to said Niles, and two thirds to the parties to this agreement; " and again, make no provision for the payment to Niles of any amount beyond the $50,000 to be paid out on the delivery of the titles or warrants. And 3d. Because, in a series of instructions which appear to have been cautiously framed, we might expect that the item of expenses would not have been omitted, if the agreement had been, that they were to be paid by the defendants. These reasons are plausible, and certainly render the question at least a debatable one. But from a full and careful view of the whole transaction, we have been led to a different conclusion.

Niles had contracted with Indians entitled to reservations under the late treaty with the Chickasaws for fifty sections of land. His contracts were made at the rate of $1,000 per sec-

tion. On these contracts he had made a nominal payment, and would be compelled to complete his payments within a limited time, or forfeit his contracts. Not having the funds necessary for that purpose, he proposed to dispose " of such proportion (of the land) as would enable him to meet his engagements at $5 the acre," or to give to any one who would advance $50,000, the sum required for that purpose, " an interest of one third of the whole speculation."

The defendants, having been informed of this offer on the part of Niles, determined tò meet the second or alternative proposition, but upon terms by which it would be materially modified. A careful consideration of the documents connected with the transaction will leave little doubt as to the light in which they regarded the agreement which was afterwards closed between them and Niles.

In the agreement entered into by them for the purpose of meeting Niles's proposition, it is recited that, " whereas it had been proposed by Niles to make a purchase of fifty sections of land in the Chickasaw country at the rate of $1,000 for each section containing six hundred and forty acres, which said fifty sections had been contracted for by said Niles," the parties whose names were subscribed thereto had " associated for that purpose;" that Samuel Stebbins, Jr., had been appointed agent for all the parties concerned, and was authorized " to apply the money to be advanced to the making of the said purchase, and to take the title or warrant to said property as trustee of the parties" to the agreement.

In the letter of instructions to their agent thus appointed, they say: " Mr. Niles to attend to-the location and survey of the said fifty sections of land, and take the warrants or titles in your own name in trust for the parties concerned."

It seems clear from this, that the defendants designed in effect to take the place of Niles in regard to his contracts for the fifty sections of land, and did not regard it so much a purchase from Niles as from the Indians. Niles was to attend to making the locations and surveys, and to take warrants or titles, not in his name, but in the name of Samuel Stebbins, their agent. It is true that Stebbins, as their agent, was to pay

29*

Niles $1,000 for every warrant or title for six hundred and forty acres thus received by him. But that does not alter the essential character of the transaction. Niles could not "take the warrants or titles" in the name of Stebbins, or of any one else, unless he had the money to pay upon each contract. The payment of $1,000 for each section was intended for the purpose, and for no other, of enabling Niles to comply with his engagements, and by that means to have the warrants or titles made directly to the agent. Niles in this was to act for all the parties interested in the speculation.

It follows, if this view of the transaction is the correct one, and the one which the defendants themselves took of it, that the expenses attendant upon the location and survey of the land/did not, properly speaking, constitute a part of the price or purchase-money to be paid by the defendants upon the delivery of the warrants or titles to the agent. These expenses were an incidental charge; the amount of which could not then be known, and which naturally and properly would be defrayed out of the proceeds of the land when sold, or contributed by the parties as they might occur.

This will appear more evident when it is borne in mind, that the main object was to secure the profits expected to arise from the speculation. This could not be done without the requisite amount of money. $50,000, or $1,000 per section, were indispensable in order to enable Niles to meet his engagements. But it was not at all necessary that Niles's expenses, incurred and to be incurred in making the locations and surveys, should be paid before the warrants or titles could be obtained from the government or the Indians. We think, therefore, that Niles's proposition to divide the expenses of locations and surveys was not virtually rejected by the directions contained in the letter of instructions by which Stebbins was required to pay $1,000 per section, upon warrant or title therefor being made to him.

If it were assumed, that the proposition in relation to the expenses attendant upon the locations and surveys was acceded to by the defendants, it would follow of course, that so soon as expenses had arisen from that source, and were paid by Niles,

his right to reimbursement would attach. And it would follow hence, if the proportion of the expenses to the reimbursement of which he was entitled, was not paid, before a sale of the lands, that the proceeds would be chargeable with the repayment.

Several very material modifications were made in Niles's original proposition; but, as we have seen, the letter of instructions is perfectly silent in regard to the items of expenses. It is highly probable, that in a series of instructions, drawn up with care, if the defendants did design to reject that part of the proposition, that express language would have been employed, manifesting such intention. The stipulation in the letter of instructions, that all moneys received by the agent on account of sales were to be applied first to the repayment of the $50,000 advanced by defendants, with interest on the same; and that all the proceeds of the land which might arise over and above that sum, and the interest thereon, should be divided, one third to Niles, and two thirds to the defendants, cannot be held to have that effect. For if it were conceded, that this stipulation was intended to apply to the gross amount of the proceeds of the land, and not to the net profits after deducting the expenses incurred in making the locations and surveys, it would not necessarily conflict with the proposition, that these expenses should be borne *pro rata.* This is clear. For if the offer in regard to the expenses was acceded to, Niles's right to repayment would accrue before an acre of the land could be sold. But we do not think that this stipulation was intended to have application to the gross amount of proceeds arising after the sums advanced by defendants, with the interest, had been refunded. It was only designed to lay down the rule for the distribution of the profits. This appears not to admit of doubt; for if otherwise understood, it would include within its operation the expenses which would occur after the locations and surveys had been completed, as well as those which had previously arisen. It will certainly not be contended, that Niles was not entitled to repayment of his expenses necessarily incurred in making sale of the land. But such would be the

result, if the expenses were not to be deducted before the division of the proceeds.

Regarding the construction which we have put upon the contract as the true one, we will proceed to the consideration of another point, which should properly precede an examination of the questions arising upon the compromise entered into by the parties in the autumn of 1844. That point is, whether the account of Niles against the defendants, for expenses under the agreement, exhibited in 1838, has by their acquiescence or their acts acquired the character of a stated account.

Niles in his bill alleges, that the account was received by defendants in the summer of 1838, and held by them without objection until 1844. The defendants say there was no acquiescence; on the contrary, they aver that the account was objected to. They say said account was presented in person by Niles, at a meeting of the association held in New York in September, 1838, and withdrawn by him upon perceiving the little favor which it met with, and the determination of the association to disallow it. This statement is sustained by one witness, Samuel Stebbins, who, as we have seen, was the agent of the company, and, at the time of the transactions deposed to, a member. This witness says he recollected the claim of $8,829.30. Other accounts were *received by him*; but when precisely he could not say. He did not remember making specific objections; but thinks that he told Mr. Niles it was extraordinary. He further says, Mr. Niles, at the meeting in the fall of 1838, of the association, presented a claim which I find was for $8,829.30. Surprise was expressed at the charge, and he withdrew the account.

This was all the evidence adduced by defendants in support of the answer in reference to this question. The deposition of Stebbins, which contains this testimony, was taken in 1847. In 1842, five years before that time, Stebbins wrote to Niles as follows: "I have no distinct recollection of any specific understanding, that the expenses of the association were to be paid before the parties were to be reimbursed. We may have talked this matter over, and it may have been agitated at the meeting at the National Hotel, but I cannot say positively that such is

the fact." Here we perceive a manifest discrepancy between the deposition of this witness and his statements previously made; which shows, at least, a very defective memory, and must, upon principle, detract materially from the weight of his testimony.

On the other side, the defendants admit that Niles, in the summer of 1838, rendered an invoice of the lands purchased for the association; which shows the cost of the same, including the expenses; the whole amount of which is stated on the invoice to be $13,242.18. In that invoice, the company are charged with their proportion of the expenses at $8,829.30, as per account rendered. From the answer and the proofs, we conclude that the defendants were in possession of the account containing the separate items of the aggregate charge for expenses incurred before the meeting of the company, which took place at the National Hotel in New York, September 10th, 1838. It appears from the minutes of that meeting, which are made an exhibit to their answer, that Niles made a general statement of his operations in behalf of the company, as regarded his purchases, character of titles, &c.; and explaining such matters as required elucidation, which was considered satisfactory by those present. Samuel Stebbins was directed, by a resolution of the meeting, to execute a power of attorney to Niles, authorizing him to effect sales of the lands agreeably to the instructions of the company, and to give bonds for titles to the purchasers. Stebbins executed the letter of attorney as directed on the 14th; and attached thereto the invoice, showing the cost of the lands to be $58,829.30. The invoice is referred to in the instrument, as the "schedule hereto annexed," at the foot of which is written, "*Pro rata* proportion of expenses as per expense account herewith handed." Stebbins at that time stood in the double relation of a member of the company and its agent.

These facts, we think, outweigh the answer, sustained as it is by the doubtful testimony of one witness. There is no rational mode of accounting for the conduct of the meeting, unless we suppose that Niles's account was satisfactory to the association. If the claim for expenses was not authorized by

the agreement, the company could have looked upon it in no other light than as an impudent and fraudulent attempt at imposition. A charge of that character, which amounted to near one fifth of the entire investment, could not have escaped observation. It was a matter which required elucidation, and it gravely admits of doubt, that unless a satisfactory explanation had been given, the proceedings of the meeting would have borne unmistakable evidence of dissatisfaction. The act of Samuel Stebbins in attaching the invoice to the power of attorney, was an implied recognition of the justice of the account. The supposition is not to be entertained, that if Stebbins thought it extraordinary, knew it to be unauthorized, and that the company had determined to disallow it, he would thus have recognized its validity. Upon a full view of the transaction, we conclude that this account was received without objection.

It is not pretended that any objection was afterwards made to this or to any other account, and communicated to Niles before December, 1843. At that time, as stated by defendants, Daniel Low, a member of the company, told Niles, that there were objectionable and inadmissible items in his account, particularly the charge for expenses of $8,829.30. Previously, however, in August, 1842, Niles had, in compliance with the wishes of the company, conveyed through their secretary, rendered another account current, which brought down his transactions to the 1st of June, (1842.) By that account, he claimed a balance in his favor of $12,312.29. The objectionable item of $8,829.30 was inserted; and defendants admit that no objections were made to it, when received, and not a word of dissatisfaction is heard for the following fifteen months. This silence is reasonably accounted for upon the supposition, that the account was satisfactory to the defendants. They, however, explain their silence in a different way. They say they made no objections, because they were apprehensive, that if they objected to Niles's account, he might become indisposed to visit New York. But how does this reason, for not making objection to the account, comport with their statement, that Low, in December, 1843, objected pointedly to Niles's account, and particularly to the expense item of $8,829.30? They were

certainly as desirous in December, 1843, that Niles should go to New York, as they had been at any previous time. How can it be supposed that the defendants, from September, 1842, to the December of the following year, were restrained from objecting to an account which they assert to be unauthorized and unjust, by the apprehension, that if objections were made to it, Niles for that reason might refuse to visit New York? and yet at the very time they are urging him to go there, they inform him that his account was unjust, and that one particular item, which constituted more than one half of his claim, would not be allowed by the company? It is said, however, that this statement in the answer is sustained by other evidence. Storrow is the only witness; he testified that he had been told by Daniel Low, that Niles's charges were disapproved of by him, and that he had so stated to Niles at Pontotoc in 1843. But Walter Jagger swears, that he had a conversation in February, 1844, with John Brown, one of the defendants, who informed him, that Low had returned from Pontotoc, and reported that Niles had conducted, and was conducting matters in Mississippi to his entire satisfaction. Storrow's testimony, therefore, adds little strength to the assertion, that Daniel Low, in 1843, while at Pontotoc, made objections to the account. The supposition that Low, whilst in Mississippi, made the objections imputed to him, to Niles's account of 1842, is irreconcilable with the previous silence of the defendants upon any ground, and particularly so upon the reason assigned in the answer. Nor is that supposition more in harmony with the tenor and manifest object of Low's letter to Niles of 2d March, 1844, or with the request contained in the letter to Orne of the 4th. In that correspondence, there is not the least hint, that the writer, or the defendants were dissatisfied with the account of Niles; rather the contrary; and the great anxiety that he should speedily visit New York is not disguised.

For these considerations, we cannot doubt, that whatever were the objections, if any, which were privately entertained by the defendants to Niles's accounts, they were never made known prior to the summer of 1844. The defendants, then, held Niles's accounts, the first from 1838, and the second from

1842 until 1844, without objection. What was the result? Did these accounts become stated accounts in 1844?

What shall constitute, according to the understanding of a court of equity, a stated account, is in some measure dependent upon the circumstances of the case. It is not essential, in any case, to the validity of a stated account, that it should be signed by the parties. *Willis* v. *Jernegan*, 2 Atk. 252. But a stated account properly exists only where accounts have been examined, and the balance admitted as the true balance between the parties, without having been paid. It is said by this court, in *Davis* v. *Tiernan & Co.*, 2 How. 804, that a stated account is an agreement between both parties that all the articles are true. But this agreement, or the admission of the party against whom the account is rendered, may be implied from circumstances. As in the case of merchants residing in different countries; if an account be transmitted from one to the other, and no objection is made after several opportunities of writing has occurred, an admission of the correctness of the account may be presumed. The retention of the account, in such cases, without objection, is evidence of the admission of the party against whom it is rendered of its justness. Hence the rule as laid down by Judge Story, " that an account rendered shall be deemed an account stated, from the presumed approbation or acquiescence of the parties, unless an objection is made thereto within a reasonable time."

Applying this rule to the facts before us, we cannot doubt that Niles's accounts, from the approbation and acquiescence of the defendants, became stated accounts in 1844.

In the order which we have proposed, the next subject of examination is the question, whether the compromise set up by the defendants in bar of the relief prayed for in the bill, was a valid adjustment of the matters embraced by its terms.

The defendants were residents of the city of New York, at which place Niles was on a visit. During his stay there they caused him to be arrested in a suit in chancery. Bail was demanded in the sum of $50,000. This bail he was unable to give. The arrest was made in the forenoon of the 15th October, 1844, and at about 5 o'clock, P. M. Niles accompanied the

officer to the house of William Stebbins, where he met Russell Stebbins, the president of the association, and their solicitor, George B. Butler. This interview continued until near 9 o'clock, p. m., when Niles having signed the agreement, he was discharged from custody. Niles was not furnished with a copy or abstract of the bill which was filed against him. There is, however, no evidence that he desired to see the bill, or requested to be furnished with an abstract of it. During the interview several propositions were made, discussed, and declined. The persons present were William Stebbins, Russell Stebbins, Samuel Stebbins, the solicitor of the company, and the officer who held Niles in custody. Niles was very desirous that the settlement should be postponed until the following day. A request to that effect was declined by Russell Stebbins, who assigned as a reason for refusing, " that every thing was then known which could be known."

These were the immediate circumstances connected with the compromise which was then entered into, and by which Niles agreed to surrender the notes and securities then in his hands for lands which had been sold, and all his interest therein, and to accept seven of the thirty-nine sections which then remained unsold, " in lieu of all claims, compensation, charges, disbursements, services, and interest in the property, assets, securities, or sales of said company." These seven sections were to be selected by lot, and conveyed to Niles as soon as it could be ascertained that " thirty-nine sections of the original fifty remained unsold and free from incumbrances had or suffered by him, and were still vested in Samuel Stebbins."

It was said in argument, that Niles was illegally arrested ; that the fiat awarding the process, which was a writ of *ne exeat*, required the defendants to give bond before it issued, but that no bond was given. The evidence in support of this position is, perhaps, insufficient ; and we will proceed to inquire, whether upon the law applicable to contracts made by a party while under imprisonment, this compromise should be enforced.

It is no objection to the validity of a contract fairly entered into, where no advantage was sought or taken by the party, that, at the time of entering into it, he was under arrest. But

Stebbins et al. *v.* Niles.

all contracts made by parties in that condition, are watched with great jealousy by courts of equity. Upon settled principle, where legal process has been used as a means of oppression, and to extort disadvantageous terms from a party in custody, instruments so obtained will be set aside. *Nicholls* v. *Nicholls*, 1 Atk. 409; *Roy* v. *Beaufort*, 2 Ib. 190; *Watkins* v. *Baird*, 6 Mass. 506; *Foshay* v. *Ferguson*, 5 Hill, 154; *Kelsey* v. *Hobby*, 16 Pet. 269.

Applying this test to the transaction, we think that the compromise should not be enforced. It is evident to us, upon the construction which we have placed upon the original contract for the purchase of the fifty sections of land, and the light in which we regard the accounts of Niles rendered in 1838 and 1842, that flagrant injustice was done to him in that settlement.

At the date of the compromise, eleven sections of the land had been sold for the aggregate amount of $50,788.30. Of that sum, Niles had received in cash $21,983.53. Notes amounting to $28,804.73, taken on account of the sales, were in his hands. From the cash received, Niles had paid to defendants $12,500. The sums paid out by him on account of expenses, amounted in the aggregate to $14,112.05. Two thirds of this sum, with interest, was properly chargeable to them. Charging Niles with interest upon the amounts received and not paid over to defendants, and debiting them with interest on the $12,500, Niles was entitled to a balance of $7,235.90. It cannot be said with propriety that Niles was debtor to the company for the uncollected notes then in his possession. In them he was interested to the extent of one third of their amount. He held them as the agent of the defendants, who could have put an end to his authority to collect them by a revocation of his power of attorney. So in regard to the original sum advanced for the purchase of the land, Niles with less reason could be said to be the debtor of the company. The lands had been paid for, and conveyed to Samuel Stebbins as trustee for the parties interested. The title to the unsold lands was still in him; and Niles could exercise no control over them except as his agent.

In this condition of things Niles visited New York, without, as we have seen, an intimation that his accounts previously rendered would be contested by the defendants. That visit was made after repeated and pressing invitations. His object, according to the statement of one of the defendants, was " to settle the affairs of the company, without delay, by a division of the lands, notes, cash," &c.  He was, as we have seen, arrested ; and bail in the sum of $50,000 was demanded of him. Not being able to give the bail required, he was held in custody until he signed the agreement, which we will proceed to show was grossly unequal and unjust.

The unpaid balance of the expense account, the payment of which Niles had a right to demand at the date of the compromise, amounted to $7,235. The defendants had received $12,500 ; and there were notes on hand taken for the land then sold, amounting to upwards of $28,800. Deduct from these amounts Niles's balance of $7,235, and the remainder, together with the proceeds of the unsold land, should be applied first to the reimbursement of the $50,000 advanced by defendants, with interest thereon, and, in the second place, should be distributed between the parties, in the proportion of one third to Niles and two thirds to the defendants.

After payment of Niles's balance, cash and notes amounting to about $35,000 would remain in the hands of the company. Estimating the value of the thirty-nine sections remaining unsold according to sales made of twenty-four of the fifty sections, they were worth $150,652 ; which amount, with the balance of cash and notes on hand at the date of the compromise, makes the sum of about $186,000. Deduct from this amount the principal advanced, with interest thereon, to the date of the compromise, which amounts to about $84,750, and we ascertain that the probable value of Niles's interest in the property of the association was about $35,000.

By the compromise, Niles gave up that interest and the balance of his expense account, which, in the aggregate, amounted to about $42,250 ; and was to receive in lieu thereof seven sections of the unsold land. These sections, at their estimated value, would be worth $27,000, which was less by $15,000 than

his interest and claims. This sacrifice was too great, the injustice too manifest, to permit us to doubt that Niles would not have consented to the arrangement, if he could by any other means have avoided imprisonment.

But it is said Niles, by subsequent acts, ratified the compromise, and should not now be heard to question its validity.

The acts relied on as amounting to circumstances of recognition are, that Niles, after the agreement had been entered into and the assets turned over to the company, expressed himself satisfied with the settlement, and to an offer, made by Russell Stebbins, to open the settlement, if he preferred, and to go on with the suit, he declined; that on the day on which the land allotted to Niles was selected, he surrendered to defendants certain securities which had been previously overlooked; and that he acquiesced in the settlement for more than a year.

It was in proof, that Niles was detained in New York, by business, until the latter part of the November following the settlement; that he was confident the whole proceeding was illegal, and felt assured, that upon his return to Mississippi he could obtain a rescission of the settlement, which he averred was obtained by unfair means. It appears, that while he remained in New York, attending to his business, he was in constant apprehension of further detention, or of being again arrested, and for that reason avoided going into public.

There is no reason to doubt his conviction as to the illegality of the agreement, and his determination to have it annulled, if practicable, on his return to this State. It is possible that his conduct in New York immediately following the settlement, and which has been construed into acts of recognition, was dictated by his apprehension of again being arrested. It must be admitted, however, that if the compromise were of doubtful illegality, we would be warranted in holding him bound by it. But the true point of inquiry here, is not, whether the compromise shall be presumed fair and equitable from these acts of recognition,—for of its invalidity we are sufficiently convinced, —but whether the rights of the defendants have not been so affected by the acts of Niles, that it would be unjust and fraudulent in him now to seek a rescission of the settlement.

Stebbins et al. *v.* Niles.

Hence, if we deny the relief prayed for, it will not be on the ground, that no unjust advantage was taken of Niles in arranging the terms of the compromise, but for the reason, that he had placed himself in an attitude in which he was not entitled to invoke the aid of a court of equity. But we apprehend that there is no pretence for saying, that such is his position. We think, therefore, that the vice-chancellor was correct in ordering the settlement to be set aside.

By the terms of the original contract, the "warrants or titles" to the fifty sections of land were to be taken by Niles to Samuel Stebbins, as trustee for the parties. Some change appears to have been made in this part of the agreement. At least it was not observed. The Indian deeds were not, in the first place, made to Stebbins, but to Niles. Why this was done, or whether it was done by the authority of the company, does not, appear, from any thing contained in the record. Niles afterwards conveyed the lands, with covenants of general warranty, to Samuel Stebbins. All of the deeds to Stebbins were executed before the 10th of September, 1838. On that day a meeting of the company was held in New York. Niles was present; he made a general statement of his operation in their behalf; exhibited his titles, and explained such matters as required elucidation, which was regarded as satisfactory by all present. A resolution was thereupon passed, to the effect, that the deeds should remain as they then stood in the name of Samuel Stebbins as transferred to him by said Niles; that said Stebbins should execute to Niles a power of attorney, authorizing him to effect sales of the land and give bonds for titles, and that said Stebbins should execute conveyances to the purchasers on the fulfilment of their contracts; and that said Stebbins should be indemnified against any loss that he might sustain, by reason of any conveyance of the lands which he might effect by deeds with covenants of general warranty of title.

The titles to seven of the sections of land which fell to the defendants, by the division under the compromise, were afterwards ascertained to be imperfect. The deeds for these sections, made by the Indians to Niles, were not approved by the

30*

president according to the stipulations of the treaty with the Chickasaws. The defendants allege in their answer, by way of cross-bill, that Niles was bound, by his contract, to furnish perfect titles, and insist that he shall be compelled to have the titles to said sections perfected, or to refund the money advanced by them in payment for the same with interest.

On the other hand, it is contended for Niles, that he was bound only to furnish the deeds of Indians entitled to reservations under the treaty, which had been located in accordance with its provisions; bearing the certificate of two of the chiefs named in the fourth article, that the Indian vendor was "competent;" and the further certificate of the agent, that the certificate of the chiefs was true, and that a fair consideration had been paid for the land by the vendee. And further, that if Niles were in fact bound by his original contract for perfect titles, or was liable on his covenants of title contained in the deeds to Samuel Stebbins, it is insisted, that he was released from all liability by the bond of indemnity executed by said Stebbins and the defendants.

That bond, we presume, was made pursuant to the resolution of the company, adopted at the meeting of the 10th of September. It was executed on the 14th of September, and was made to Niles as well as Stebbins; the latter occupying the double capacity of obligor and obligee. If it should be held, that this bond relieved Niles from all obligation in regard to the titles, it will become unnecessary to examine the first proposition.

It is recited in the bond of indemnity, that the obligors were equally interested in the purchase of fifty sections of land "designated by deeds from said Niles to said Stebbins;" "that the transfers were made at the instance of the obligors;" that they, having confidence in the Indian titles acquired through said Niles, and being desirous of saving harmless the obligees, bound themselves "to protect and defend any and all such warrantee deeds as now are or may be issued by the parties of the second part, predicated on Indian titles;" and "in the event of difficulty in or with any one of said titles," to indemnify them for "all expense or loss" occasioned thereby.

Stebbins et al. *v.* Niles.

It is our duty to place that construction upon the indemnity which will best accord with the intention of the parties. To arrive with certainty at that interpretation, we must direct our attention to the condition and relative position of the parties, as well as the language of the instrument.

Samuel Stebbins was the holder of the legal title to the land. It was indispensable, therefore, that all titles should proceed from him. In all transfers he would be personally responsible upon the covenants for title contained in his deeds. Hence, it was important to him, that he should have indemnity against such responsibilities. Niles stood in a very different attitude. If bound at all, he was bound by the covenants in his deeds to Stebbins. A covenant of warranty of title inserted in a deed executed by Stebbins, would neither add to nor diminish his obligations. As the agent or attorney of Stebbins in effecting sales, he incurred no personal responsibility to the vendees. He could transfer the legal title, which was in Stebbins, and might bind him by covenants. It could not, therefore, have been the object of the obligors in the bond to secure Niles against any future liability. His liability arose either under the original agreement, or upon his covenants to Stebbins. That was a past liability. We are compelled to understand the bond as referring to that liability and to no other, so far as Niles was concerned. Any other interpretation would deprive definite and express terms of all meaning. The obligors bound themselves to "defend and protect any and all such warrantee deeds" as were then issued by the obligees, predicated on Indian titles. To what deeds could this language have reference, if not to the deeds of Niles conveying the land to Stebbins, who then had made no transfers? It is important to observe, that the bond is several and not joint as to Niles and Stebbins. We are satisfied, that it was the intention of the company to indemnify Niles against any loss or damage which might arise from his deeds to Stebbins; and Stebbins from the consequences of future warranties.

Holding this view of the subject, our next inquiry is as to the light in which we are to regard the indemnity. Shall we give to it the effect and operation of a release, by which Niles

Ex parte Dyson.

was discharged from all his obligations arising from his previous covenants of warranty?

We do not doubt, if at the suit of third. persons Niles were made liable upon his covenants in the deeds to Stebbins, that Niles could recover, in an action against the obligors, all the damages previously assessed against him. It is equally clear, that Samuel Stebbins could not, in the face of his covenant to save Niles harmless against all liability on his warranties; for a breach of those warranties, maintain an action at law against Niles. It is in effect, therefore, a covenant not to sue. No formal words are necessary to constitute a release, where the intention of the parties is manifest. A covenant, therefore, not to sue, must, we think, in the very nature of things, amount to a release.

We have examined the different objections urged to the decree, and after a careful consideration of the whole subject, we are satisfied that there was no error in it.

Decree affirmed.

The plaintiffs in error, by their attorneys, filed a petition for a reargument, which was refused by the court.